IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - x
                          :  Chapter 11
In re:                    :
                          :  Case No. 02-10118 (MFW)
The IT Group, INC.,       :
     et al.,              :  Jointly Administered
                          :
          Debtors.        :  Bid Procedures Hearing Date:
                          :  2/12/02 @ 9:00 a.m.
                          :  Bid Procedures Objections Due:
- - - - - - - - - - - - - X  2/05/02 @ 4:00 p.m.
```

**MOTION FOR ORDER (I) APPROVING (A) ASSET
PURCHASE AGREEMENT FOR SALE OF SUBSTANTIALLY
ALL OF THE ASSETS OF THE DEBTORS' BUSINESS,
(B) BIDDING PROCEDURES IN CONNECTION WITH THE SALE
AND (C) BREAK-UP FEE AND EXPENSE REIMBURSEMENT IN CONNEC-
TION THEREWITH, (II) AUTHORIZING SALE OF ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
(III) DETERMINING THAT SUCH SALE IS EXEMPT FROM
ANY STAMP, TRANSFER, RECORDING, OR SIMILAR TAX,
(IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, AND (V) GRANTING RELATED RELIEF**

The IT Group, Inc. ("The IT Group") and certain
of its subsidiaries and affiliates (the "Affiliate Debt-
ors"), debtors and debtors-in-possession (collectively,
the "Debtors"), submit this motion (the "Motion") for an
Order (I) approving (a) the asset purchase agreement[1] for

---

[1]     Unless otherwise defined, capitalized terms used
        herein shall have the meaning ascribed to them in
                                        (continued...)

the sale (the "Asset Sale") of substantially all of the assets (the "Assets") of the Debtors to the Shaw Group, Inc. or its designee ("Shaw") or another bidder submitting a higher or better offer acceptable to the Debtors at the Auction (as defined below), (b) bidding procedures in connection with such Asset Sale and (c) bidding protections, including a break-up fee and expense reimbursement (the "Break-Up Fee and Expense Reimbursement) to be paid to Shaw in the event Shaw is not the Successful Bidder (as below) at the Auction, (II) authorizing the sale of the Assets free and clear of all liens, claims, encumbrances and interests, (III) determining that such Asset Sale is exempt from any stamp, transfer, recording or similar tax, (IV) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (V) granting related relief. In support of the Motion, the Debtors respectfully represent as follows:

---

[1]     (...continued)
the asset purchase agreement.  Because of its voluminous nature, the asset purchase agreement is not being sent to each of the parties receiving notice of this Motion.  It is available from the Court and upon request from the undersigned counsel to the Debtors.

## BACKGROUND

### A.    The Chapter 11 Filings

1.    On January 16, 2002 (the "Petition Date"), the Debtors each filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  These cases are being jointly administered under Case No. 02-10118 (MFW).

2.    A creditors' committee was appointed in these cases by the United States Trustee on January 25, 2002.  No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases.

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 105, 363, 365, 1107, and 1108 of the Bankruptcy Code.

### B.    The Debtors' Businesses

5.    The IT Group is the parent company of approximately 92 subsidiaries and has direct and indirect ownership interests in approximately 43 limited liability companies and joint ventures (collectively, the "Company").  Only The IT Group and 69 of its direct and indirect subsidiaries are debtors and debtors-in-possession.

6.    The Company is a leading provider of diversified services in the areas of consulting, engineering and construction, remediation, and facilities management.  The Company conducts business in 48 states and 10 countries around the world.  The Company has over 6,400 employees employed in six divisions or business lines: Government Services, Commercial Services, Solid Waste, Transportation and Telecommunication, Real Estate Restoration, and International.

7.    Commencing in 1997, the Company embarked on an acquisition and diversification strategy pursuant to which the Company acquired eleven firms with the expectation that it would be able to realize economies of scale with these new but related businesses.  The assimilation of the acquired businesses did not, however, provide the expected benefits, and the Company began to

experience financial difficulties that were accelerated by the slowing economy.

8. By the end of the last quarter of 2001, the Company was unable to timely pay all of its trade payables, and many of the Company's vendors and subcontractors delayed and even stopped working on the Company's projects. In an attempt to reduce debt and raise working capital, the Company thus began seeking buyers for certain assets, and on January 15, 2002, the Company signed a letter of intent with Shaw regarding a sale of substantially all of Debtors' assets and certain of its liabilities (the "Letter of Intent"). On January 23, 2002, the Company and Shaw executed a definitive agreement with respect to such transaction (as amended or modified, the "Agreement"). The Company commenced these cases to effectuate the sale to Shaw or such other bidder submitting the highest and best bid for the Company's assets.

## RELIEF REQUESTED

9. By this Motion, the Debtors request that the Court enter an Order, substantially in the form of Exhibit A attached hereto, (the "Procedures Order") approving (i) the bidding procedures (the "Bidding Procedures") for the Auction, (ii) the bidding protections

(the "Bidding Protections"), including the Break-Up Fee
and Expense Reimbursement of $6 million to be paid to
Shaw under certain circumstances, including, but not
limited to, a sale of the Assets to a party other than
Shaw, (iii) the setting of the hearing to authorize and
approve the Asset Sale (the "Sale Hearing"); and (iv) the
form of notice of the Auction and Sale Hearing (the
"Notice of Auction and Sale Hearing").  The Bidding
Procedures, Bid Protections and Notice of Auction and
Sale Hearing are attached as Exhibit 1 to the Procedures
Order.  The hearing on the Bidding Procedures is sched-
uled for February 12, 2002 at 9:00 a.m.

       10.  The Debtors further request that at the
Sale Hearing the Court enter an order, substantially in
the form of Exhibit B attached hereto, (the "Sale Order")
authorizing the Debtors to (i) sell substantially all of
the Assets, free and clear of all liens, claims, and
interests (other than certain specified assumed liabili-
ties), on substantially the terms and conditions set
forth in the Agreement; (ii) assume certain of the execu-
tory contracts and unexpired leases associated with the
Debtors' business (the "Assumed Contracts"); (iii) assign
the Assumed Contracts to Shaw or the Successful Bidder,
and (iv) allow Shaw or the Successful Bidder to pay the

amounts, if any, necessary to cure existing defaults or
arrearages under the Assumed Contracts.

**BASIS FOR RELIEF**

**A.   Background**

11.  As noted above, by the last quarter of
2001, the Debtors' financial condition had compelled them
to undertake a search for a purchaser of substantially
all of their assets.  For that purpose, the Debtors
retained Lehman Brothers to assist them in finding and
soliciting potential purchasers.  After evaluating the
interest expressed by various parties, the Company ap-
proached Shaw regarding a sale of substantially all of
Debtors' assets and certain of its liabilities pursuant
to sections 363 and 365 of the Bankruptcy Code.

12.  In the last week of December and the first
week of January, Shaw performed substantial due diligence
to determine whether it was interested in pursuing a
transaction with the Company, and on January 15, 2002
entered into the Letter of Intent.  Over the next week,
the parties negotiated the terms of a definitive agree-
ment, and on January 23, 2002, Shaw and the Company
entered into the Agreement.

13. The Agreement contemplates a sale of substantially all of the Assets to Shaw or its designee (the "Shaw Sale"). The Debtors believe that the Shaw Sale is the best way to preserve the value of the Debtors' business, and in the best interest of the Debtors' estates and creditors, including their employees and customers, vendors, subcontractors. Accordingly, the Debtors seek approval of the Procedures Order and the subsequent approval of the Agreement at the Sale Hearing.

**B.    The Asset Purchase Agreement**

14. Pursuant to the Agreement, the Debtors will (i) sell substantially all of the Assets used in operating the Debtors' business, free and clear of all liens, claims, interests and encumbrances and (ii) assume and assign certain assumed contracts (the "Assumed Contracts") to Shaw.

15. The Agreement was negotiated at arm's-length and in good faith by the Debtors and Shaw, with input from the Debtors' prepetition secured lenders (the "Prepetition Lenders") following thorough consideration of the Company's possible restructuring alternatives. The Debtors believe that the consideration to be received from the Asset Sale as set forth in the Agreement, subject to the ability of interested parties to submit

competing proposals for the Assets, will result in the highest and best value for the Debtors' estates, creditors and interest holders.

16. The Agreement[2] generally provides the following:

(a) <u>Purchase Price</u>. On the Closing Date (as defined in Section 1.01 of the Agreement), Shaw will (i) pay the Debtors $105,000,000 in cash and/or Shaw common stock, (ii) assume certain liabilities of the Debtors and (iii) pay an amount of cash equal to the sum of (1) cash required to pay the Debtor's accrued but unpaid payroll as of the Closing Date and (2) the amount of cash required to fund a retention plan for the Company's employees.

(b) <u>Assets</u>. The proposed sale will include the Assets (as defined in Section 1.01 of the Agreement), which comprise substantially all of the value of the Company.

(c) <u>Sale Free and Clear</u>. The Assets are to be transferred free and clear of all Encumbrances (as defined in Section 1.01 of the Agreement) other than Assumed Liabilities (as defined in Section 1.01 of the Agreement) pursuant to section 363(f) of the Bankruptcy Code.

(d) <u>Assumption of Executory Contracts and Leases</u>. Debtors shall assign to Shaw, and Shaw shall assume from Debtors, the Assumed Contracts. Shaw may on any Tuesday or Friday up to seven (7) business days prior to the Bid Deadline (as defined in Section 1.01 of the Agreement), provide

---

[2]   To the extent this summary of the Agreement differs in any way with the terms of the Agreement, the Agreement controls.

written notice to Debtors of any Designated Contract which Shaw desires to exclude from the Assets. Shaw shall pay any and all cure and reinstatement costs or expenses of or relating to the assumption and assignment of the Designated Contracts.

(e) <u>Right To Terminate</u>. Shaw and Debtors may terminate the Agreement (i) if the Closing shall not have occurred on or before April 30, 2002 or (ii) if the non-terminating party is in breach of the representations, warranties, covenants or agreements of such party and such breach or breaches, individually or in the aggregate, would result in a Buyer Material Adverse Change (as defined in Section 1.01 of the Agreement) in the case of Shaw or a Material Adverse Change (as defined in Section 1.01 of the Agreement) in the case of the Debtors.

Shaw may unilaterally terminate the Agreement if:

(A) the Bankruptcy Court approves a Qualified Bid (as defined in Section 1.01 of the Agreement) by a Qualified Bidder (as defined in Section 1.01 of the Agreement) other than Shaw, or Debtors accept or support a Qualified Bid by a Qualified Bidder other than Shaw;

(B) the Debtors elect not to pursue the transaction or elect to pursue a Stand-Alone Plan (as defined in Section 1.01 of the Agreement);

(C) any of the bankruptcy cases is dismissed or converted to chapter 7 of the Bankruptcy Code or a trustee is appointed for any Debtors;

(D) the Buyer Protection and Bidding Procedures Order shall not have been en-

tered by February 5,[3] 2002; or

(E) both the Sale Order and the Executory Contract Assumption and Assignment Order shall not have been entered by March 31, 2002.

(f) <u>Break-Up Fee and Expense Reimbursement</u>: If (i) the Buyer Protection and Bidding Procedures Order has not been entered and (ii) (A) any Debtor, without accepting a competing proposal, either (I) chooses to pursue a Stand-Alone Plan (as defined in Section 1.01 of the Agreement) or (II) breaches the Agreement so as to cause Shaw to terminate the Agreement, or (B) Shaw is otherwise entitled to terminate the Agreement due to the actions of Debtors or due to Debtors' pre-petition bank lenders credit bidding, and Shaw does so terminate the Agreement, then Shaw shall be entitled to be paid by the Debtors $3,000,000; <u>provided</u> <u>however</u>, that if within twelve (12) months after the occurrence of such events, Debtors enter into a definitive agreement with respect to a competing proposal, then Debtors shall pay Shaw an additional $3,000,000. After the Buyer Protection and Bidding Procedures Order has been entered and provided that Shaw is not in default under the Agreement, Debtors shall pay Shaw $6,000,000, in accordance with the following provisions:

(A) if Shaw elects to terminate the

Agreement as a result of the Bankruptcy Court approving a Qualified Bid by a Qualified Bidder other than Shaw, or Debtors accept or support a Qualified Bid by a Qualified Bidder other than Shaw, on the earlier of (x) three (3) months after the date of the approval of the Qualified Bid

---

[3]  The Debtors believe this date will be amended in the Agreement to reflect that the hearing on the Procedures Order has been scheduled by the Court for February 12, 2002.

by a Qualified Bidder other than Shaw or
the date that Debtors accept a Qualified
Bid by a Qualified Bidder other than Shaw
and (y) the closing of the transaction
involving such Qualified Bid by a Qualified
Bidder other than Shaw approved by the
Bankruptcy Court or accepted by Debtors;
and

(B)  if Shaw elects to terminate the

Agreement because (i) Debtors are is in
breach of the representations, warranties,
covenants or agreements in the Agreement
and such breach or breaches, individually
or in the aggregate, would result in a
Material Adverse Change or (ii) Debtors
elect not to pursue the transaction or
elect to pursue a Stand-Alone Plan, and
Shaw does so terminate the Agreement, on
the first business day following such
termination.

If the Bankruptcy Court, notwithstanding the
lack of another Qualified Bid and despite Debt-
ors' compliance with the Agreement, fails to
enter the Sale Order and the Executory Contract
Assumption and Assignment Order on or prior to
March 31, 2002, then Debtors shall pay Shaw
$3,000,000; <u>provided</u> <u>however</u>, that if within
twelve (12) months after the date the Bankruptcy
Court fails to approve the Agreement, Debtors
enter into a definitive agreement with respect
to a competing proposal, Debtors shall pay Shaw
an additional amount equal $3,000,000, payable
on the first business day after the consummation
of the transaction.

## C.    The Bidding Procedures

17.  The Debtors have determined that the

proposed structure for the Bidding Procedures is the one

most likely to maximize the realizable value of the

Assets for the benefit of the Debtors' estates, creditors

and other interested parties.  In addition, section 5.01
of the Agreement requires the Debtors to obtain entry of
the Procedures Order as a means of implementing the Asset
Sale to Shaw.  Accordingly, the Debtors seek approval of
the Bidding Procedures set forth below.

18.  Under the Bidding Procedures, only quali-
fied bidders (the "Qualified Bidders") may submit bids
for the Assets or otherwise participate in the Auction.
Qualified Bidders are those entities who (i) have deliv-
ered to The IT Group an executed confidentiality agree-
ment in form and substance substantially the same as the
one executed by The IT Group and Shaw (except that dis-
closure of the Qualified Bidder's interest and proposal,
but not its identity, shall be permitted), (ii) have
delivered to The IT Group a Qualified Bid (as defined
below) (including an indication of the assets sought to
be acquired which shall include substantially all of the
assets of the Debtors to be acquired by Buyer and a
purchase price range) that the Board of Directors of The
IT Group determines, in good faith and upon the advice of
an independent financial advisor of nationally recognized
reputation, would result in a transaction more favorable
to the Debtors from a financial point of view than the
Asset Sale to Shaw, and (iii) is reasonably likely (based

on availability of financing, experience and other considerations) to be able to consummate a transaction based on the Competing Proposal, if selected as the successful bidder.

19. Any Qualified Bidder who desires to make a competing offer for all or some of the Assets must submit a written copy of its bid to the undersigned counsel for the Debtors, who shall then distribute copies of the bids to (i) counsel for the Debtors (ii) counsel for the Prepetition Lenders, (iii) counsel for Shaw, and (iv) counsel for the Creditors' Committee. A qualified competing bid (a "Qualified Bid") is a competing proposal (a) the value of which must be greater than the sum of: (i) the value of Shaw's offer, including but not limited to the amount of the cash and share consideration to be paid by Shaw and the amount of the Assumed Liabilities assumed by Shaw, which Assumed Liabilities shall include repayment of the amount outstanding under the Credit Agreement, and (ii) $8 million, the initial Minimum Incremental Bid Amount (as defined in the Agreement); (b) that has substantially the same terms and conditions as the Agreement and proposes to purchase substantially all of the Assets, and (c) is accompanied by satisfactory

evidence of committed financing or other ability to
perform.

   20. If the Debtors receive a Qualified Bid,
the Debtors will conduct the Auction at the offices of
Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney
Square, Wilmington, Delaware 19801, on the date deter-
mined by the Court at the Bid Procedures hearing. Bid-
ding at the Auction will commence with the highest Quali-
fied Bid and continue in increments of not less than $2
million until all parties have made their final offers.
At the conclusion of the bidding, the Debtors will an-
nounce their determination as to the person or entity
(the "Successful Bidder") submitting the highest or best
bid for the Assets (the "Successful Bid"). In making
that determination, the Debtors will consider, among
other things, the total consideration to be received by
their estates after taking into account the payment of
the Break-Up Fee and Expense Reimbursement.

   21. If the Debtors do not receive any Quali-
fied Bids, the Debtors will report the same to the Court
at the Sale Hearing and proceed with the Asset Sale with
Shaw under the Agreement. If, however, the Debtors re-
ceive one or more Qualified Bids and the Auction is
conducted, the Debtors will notify the Court of the

results of the Auction and proceed with the Asset Sale with the Successful Bidder.

22. The Debtors will be deemed to have accepted a Qualified Bid only when such Bid has been approved by the Court at the Sale Hearing.  Upon failure to consummate the Asset Sale because of a breach or failure on the part of the Successful Bidder, the Debtors may select in their business judgment the next highest or otherwise best Qualified Bid to be the Successful Bid without further order of the Court.  By making a bid, a Qualified Bidder shall be deemed to have agreed to keep its offer open until the consummation of the Asset Sale.

23. The Debtors may: (a) determine, in their business judgment, which Qualified Bid is the highest or otherwise best offer and (b) reject at any time before entry of an order of the Court approving a Qualified Bid, any bid that, in the Debtors' sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Agreement, or (iii) contrary to the best interests of the Debtors, their estates and/or their creditors.

## D.    Bidding Protections

24.    Shaw has expended, and likely will con-
tinue to expend, considerable time, money and energy
pursuing the Asset Sale and has engaged in extended
arm's-length and good faith negotiations.  In recognition
of this expenditure of time, energy and resources, and
the benefits of securing a stalking horse or minimum bid,
the Debtors have agreed to provide the Bidding
Protections to Shaw.  Specifically, the Bidding
Protections: (i) require Court approval the Break-Up Fee
and Expense Reimbursement in the amount of $6 million,
(ii) provide that Shaw's claim to the Break-Up Fee and
Expense Reimbursement be entitled to superpriority admin-
istrative claim treatment in these Cases, senior to all
other superpriority claims, (iii) establish a date by
which initial Qualified Bids must be submitted,
(iv) establish the Sale Hearing procedures for an auction
at which only Qualified Bidders who have previously
submitted a Qualified Bid may bid, (v) set the minimum
incremental bid amount at the Auction at $2 million,
(vi) require the Debtors to promptly provide a copy of
any Qualified Bid to Shaw and to any Qualified Bidder who
has submitted a Qualified Bid and (vii) provide that
notwithstanding the definition of "Qualified Bidder" the

Prepetition Lenders of the Debtors may not credit bid the secured debt of the Debtors held by such lenders.

25. The Bidding Protections were a material inducement for, and a condition of, Shaw's entry into the Agreement. The Debtors believe that they are fair and reasonable in view of among other things (a) the intensive analysis, due diligence investigation, and negotiation undertaken by Shaw in connection with the Asset Sale and (b) the fact that the efforts of Shaw have increased the chances that the Debtors will receive the highest and best offer for the Assets, to the benefit of the Debtors, their estates, their creditors, and all other parties in interest.

26. Shaw is unwilling to commit to hold open its offer to purchase the Assets under the terms of the Agreement unless the Procedures Order authorizes payment of the Break-Up Fee and Expense Reimbursement. Thus, absent entry of the Procedures Order and approval of the Bidding Protections, the Debtors may lose the opportunity to obtain what they believe to be the highest and best, and perhaps the only, available offer for the Assets.

27. The Debtors thus request that the Court authorize payment of the Break-Up Fee and Expense Reim-

bursement pursuant to the terms and conditions of the Agreement.

28.   As set forth more fully below, the Debtors believe that the Bidding Procedures and Bidding Protections are fair and reasonable and, combined with Shaw's offer to acquire the Assets, will work to maximize the value realized by the Debtors' estates.

**E.   Notice of Sale Hearing**

29.   The Debtors will serve a copy of this Motion upon (i) the Office of the United States Trustee; (ii) counsel for the Creditors' Committee (upon formation) (iii) counsel for Shaw; (iv) counsel for the Prepetition Lenders; (v) all entities known to have expressed a <u>bona fide</u> interest in a transaction with respect to the Assets during the past four months; (vi) all entities known to have an Interest (defined below) in the Assets; (vii) all federal, state, and local regulatory or taxing authorities or recording offices that have a known interest in the relief requested by the Motion; (viii) the creditors identified on the Debtors' List of Creditors Holding the Fifty Largest Unsecured Claims; (ix) the United States Attorney's office; (x) the Securities and Exchange Commission; (xi) the Internal Revenue Service; (xii) the Pension Benefit Guaranty Corporation,

(xiii) the Environmental Protection Agency, and (xv) all
other entities that have filed requests for notices
pursuant to Bankruptcy Rule 2002.

**F.   Assumption and Assignment of Contracts**

30.   As part of the Motion, the Debtors also
seek authority to assume and assign the Assumed Contracts
to Shaw or the Successful Bidder.

31.   With respect to the Assumed Contracts, the
Debtors will file with the Court and serve on each party
to an Assumed Contract notice of the Debtors' intention
to assume and assign that party's contract to Shaw or the
Successful Bidder (the "Assignment Notice").  The Debtors
will mail the Assignment Notice and the Motion within ten
days after the date upon which Shaw designates an agree-
ment or contract as an Assumed Contract, but in no event
less than 15 days prior to the Sale Hearing.  The Assign-
ment Notice will set forth the monetary amount the Debt-
ors believe to be necessary to cure any and all monetary
defaults with respect to the Assumed Contract pursuant to
section 365 of the Bankruptcy Code (the "Cure Amount")
and provide the contracting parties with an opportunity
to object to (i) the assumption and assignment, (ii) the
Cure Amount, or (iii) both.  If no objection is timely
received, the Cure Amount set forth in the Assignment

Notice will be controlling notwithstanding anything to the contrary in any Assumed Contract or other document and the nondebtor party to the Assumed Contract will be forever barred from asserting any other claim arising prior to the assignment against the Debtors or Shaw or the Successful Bidder as to such Assumed Contract. If an objection to the assumption and assignment is made, such objection will be held at the Sale Hearing. If an objection by the non-debtor contracting party is made only with respect to the Cure Amount, a hearing to fix the Cure Amount will be set for the first hearing date available from the Court after the Sale Hearing and materially agreeable to the parties after the Sale Hearing; provided, however, that the Debtor and Shaw reserve their right to reject an executory contract until such time as the Cure Amount is fixed and accepted.

32. The effective date of any assumption and assignment of any Assumed Contract shall be the date on which the Asset Sale closes. Accordingly, any Cure Amounts to be paid under any Assumed Contract will also be paid upon the closing of the Asset Sale or as soon thereafter as the Cure Amount is fixed and accepted by Shaw.

**APPLICABLE AUTHORITY**

**A.   The Asset Sale Is Within The Debtors' Sound
Business Judgment.**

33.   Bankruptcy Code section 363(b)(1) pro-
vides:  "The Trustee, after notice and a hearing, may
use, sell, or lease, other than in the ordinary course of
business, property of the estate."  Bankruptcy Code
section 105(a) provides in relevant part: "The Court may
issue any order, process, or judgment that is necessary
or appropriate to carry out the provisions of this ti-
tle."

34.   A sale of a debtor's assets should be
authorized pursuant to Bankruptcy Code section 363 if a
sound business purpose exists for doing so.  <u>See</u>, <u>e.g.</u>,
<u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983); <u>In re
Martin</u>, 91 F.3d 395 (3d Cir. 1996).

35.   Courts have applied four factors in deter-
mining whether a sound business justification exists:
(i) whether a sound business reason exists for the pro-
posed transaction; (ii) whether fair and reasonable
consideration is provided; (iii) whether the transaction
has been proposed and negotiated in good faith; and
(iv) whether adequate and reasonable notice is provided.
<u>See</u> <u>Committee of Equity Sec. Holders v. Lionel Corp. (In</u>

re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)
(setting forth the "sound business purpose" test);
Abbotts Dairies, 788 F.2d at 145-47 (implicitly adopting
the articulated business justification test of Lionel
standard and adding the "good faith" requirement); In re
Delaware & Hudson Ry. Co., 124 B.R. at 176 (adopting
Lionel in this District).

36. The Debtors believe that the Asset Sale is
the best way to preserve the enterprise value of the
Assets and maximize the value of the Debtors' estates for
the benefit of the Debtors' creditors and other parties
in interest.

### 1. The Sale of the Assets Satisfies the Sound Business Purpose Test.

37. There is more than adequate business
justification to sell the Assets to Shaw or the Success-
ful Bidder. As set forth above, the Debtors believe that
the proposed Asset Sale in accordance with the procedures
set forth in the Bidding Procedures maximizes recoveries
to the estates. See In re Tempo Technology Corp., 202
B.R. 363 (D. Del. 1996), aff'd, 141 F.3d 1155 (3d Cir.
1998) (sale of substantially all of a chapter 11 debtor's
assets pursuant to a section 363(b) motion where the
debtor "faced a severe cash shortfall and had no readily

available source of investment capital or loans," and would shortly have run out of cash absent the debtor-in-possession financing provided by the prospective purchaser); see also In re Delaware and Hudson Railway, 124 B.R. at 177 (affirming bankruptcy court's approval of sale of substantially all assets where debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); Titusville Country Club, 128 B.R. at 400 (bankruptcy court granted expedited hearing on 363(b) motion based on "deterioration" of debtor's assets); In re Coastal Indus., Inc., 63 B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving expedited 363(b) sale five weeks post-petition to buyer with "the name recognition required by [the debtor's] customers" where debtor was suffering operating losses and lacked financing to continue its operations).

38.    Based upon an analysis of the Debtors' ongoing and future business prospects, the Debtors' management, Board of Directors, and financial advisors have concluded that, given the company's continuing cash losses, its inability to obtain additional financing, the competitive nature of their industry, and their diminishing operating and profit margins, the best way to maxi-

mize the value of their estates is to sell their assets as a going business concern, thereby preserving the substantial goodwill of the business, maintaining customer relationships and avoiding a liquidation sale of the Debtors' business at depressed prices.

39.  Shaw has offered substantial value for the Assets and is willing to close within 60 days, and thereby enable the Debtors to reduce the risk that enterprise value will deteriorate.  Moreover, by selling the Assets now, the Debtors will relieve themselves of certain ongoing costs and expenses, thereby minimizing administrative expenses and maximizing creditor recoveries.  Accordingly, well-articulated business reasons exist for approving the Asset Sale, such that the "business purpose" test under Bankruptcy Code section 363 is met.  See Lionel, 722 F.2d at 1071 ("most important[] perhaps, [is] whether the asset is increasing or decreasing in value").

## 2.    The Consideration Offered by is Fair and Reasonable.

40.  The Debtors submit that a sale of the Assets pursuant to the Agreement will provide fair and reasonable consideration to the Debtors' estates.  The Agreement requires Shaw to pay a minimum of $105 million

for the Assets as well as to assume certain liabilities and forgive indebtedness under the Debtor-in-possession facility in the projected amount of approximately $50 million. The Debtors respectfully submit that such consideration in exchange for the Assets is both fair and reasonable.

41. Moreover, to dispel any doubt, the Asset Sale is subject to a market check and the solicitation of competing bids, thereby ensuring that the Debtors will receive the highest and best value for the Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ulti-mately be demonstrated by a "market check" and auction process -- the best means for establishing whether a fair and reasonable price is being paid. Accordingly, the consideration to be paid for the Assets will be both fair and reasonable and should be entitled to all of the protections of Bankruptcy Code section 363(n).

### 3. The Agreement Was Negotiated in Good Faith.

42. The Agreement is the product of extensive arm's-length negotiations between Shaw and the Debtors. These negotiations have involved substantial time and energy by the parties and their professionals, and the

Agreement reflects give-and-take and compromises by both sides.

43. Moreover, the Bidding Procedures ensure that a prospective purchaser will not be able to exert any undue influence over the Debtors. Under the circumstances, this Court should therefore find that (i) the sale of the Assets is the result of good faith arm's-length negotiations and (ii) Shaw or the Successful Bidder is entitled to all of the protections of Bankruptcy Code section 363(m).

**4. Adequate Notice of the Asset Sale is Being Provided.**

44. The final element for the approval of a sale under Bankruptcy Code section 363 is the requirement that interested parties receive adequate notice. Given the number of creditors and the extremely urgent nature of the relief requested, the Debtors intend to serve this Motion or notice of this Motion on (i) the Office of the United States Trustee; (ii) counsel for Shaw; (iii) counsel for the Prepetition Lenders; (iv) counsel to the Official Committee of Unsecured Creditors (when formed); (v) all entities known to have expressed an interest in a transaction with respect to the Assets during the past four months; (vi) all entities known to have an Interest

in the Assets; (vii) all federal, state, and local regulatory or taxing authorities or recording offices which have a known interest in the relief requested by the Motion; (viii) all non-Debtor parties to contracts designated as Assumed Contracts; (iv) the creditors identified on the Debtors' List of Creditors Holding the Fifty Largest Unsecured Claims; (x) the United States Attorney's office; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; (xiii) the Pension Benefit Guaranty Corporation, (ivx) the Environmental Protection Agency, and (xv) all other entities that have filed requests for notices pursuant to Bankruptcy Rule 2002.

45. The Debtors submit that, under the circumstances, such limited notice is reasonable and appropriate pursuant to Bankruptcy Rule 2002(i) because it will enable the Debtors to comply with the deadlines set forth in the Agreement, it will save the Debtors' estates from the extreme expenses associated with the service of hundreds of pages of documents on thousands of creditors, and it will limit further declines in the value of the Assets.

## B.    The Bidding Protections are Warranted

46.    To compensate Shaw for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtors and Shaw seek authority for the Debtors to provide Shaw with the Bidding Protections in the event they are not the Successful Bidder.  The Debtors and Shaw believe that the Bidding Protections are reasonable, given the benefits to the estates of having a definitive Agreement and the risk to Shaw that a third-party offer ultimately may be accepted, and that the Bidding Protections are necessary to preserve and enhance the value of the Debtors' estates.

47.    Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Bidding Protections under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Integrated Resources, 147 B.R. 650, 657-58 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to permit such fees in bankruptcy: "whether (1) relationship of parties who negotiated break-up fee is tainted by self-dealing or manipulation; (2) whether fee hampers, rather than en-courages, bidding; and (3) amount of fee is unreasonable relative to purchase price").

48. Recently, the United States Court of Appeals for the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accord-ingly, to be approved, bidding incentives must provide some benefit to the debtor's estate. See Id. at 533.

49.  The <u>O'Brien</u> Court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." <u>Id</u>. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  <u>Id</u>.

50. Under the "business judgment rule" and more importantly, under the Third Circuit's "administrative expense" standard, the Bidding Protections pass muster.  The Agreement and the Bidding Protections are the product of extended good faith, arm's-length negotiations between the Debtors and Shaw.  They are fair and reasonable in amount, particularly in view of Shaw's efforts to date, the risk to Shaw of being used as a "stalking horse," and the stabilizing effect that the execution of the Agreement is expected to have on the Debtors' business (thereby preserving value for creditors

and increasing the likelihood of additional bidding).
Further, the Bidding Protections already have encouraged
competitive bidding, in that Shaw would not have entered
into the Agreement without these provisions.  The Bidding
Protections thus have "induc[ed] a bid that otherwise
would not have been made and without which bidding would
[be] limited."  Similarly, Shaw's offer, which was formu-
lated only after an expedited, but substantial due dili-
gence review of the Assets and their value, provides a
minimum bid on which other bidders can rely, thereby
"increasing the likelihood that the price at which the
[Assets will be] sold will reflect [their] true worth."
Finally, the mere existence of the Bidding Protections
permits the Debtors to insist that competing bids for the
Assets be materially higher or otherwise better than the
Agreement, a clear benefit to the Debtors' estates.

        51.  In sum, the Debtors' ability to offer the
Bidding Protections enables them to ensure the Sale of
the Assets to a contractually-committed bidder at a price
they believe to be fair while, at the same time, provid-
ing them with the potential of even greater benefit to
the estates.  Accordingly, the Bidding Protections should
be approved.

**C. The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests.**

52. Under Bankruptcy Code section 363(f), a debtor-in-possession may sell property free and clear of any lien, claim or interest in such property if, among other things:

(a) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b) such entity consents;

(c) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(d) such interest is in bona fide dispute; or

(e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to approve the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (collectively, the "Interests"). See 11 U.S.C. § 363(f); Michigan Employment Security Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir.

1991) (section 363(f) written in disjunctive; court may
approve sale "free and clear" provided at least one of
the subsections is met); <u>Citicorp Homeowners Servs., Inc.</u>
<u>v. Elliot (In re Elliot)</u>, 94 B.R. 343 (E.D. Pa. 1988)
(same).

53.    The Debtors believe that the only entities
holding a lien on the Assets are the Prepetition Lenders.
The Prepetition Lenders are aware of the proposed sale
and, thus, the Debtors are confident that they will
obtain any necessary consent on or before the Sale Hear-
ing, thereby satisfying Bankruptcy Code section
363(f)(2).  Moreover, to the extent there exist other
possible holders of Interests, the Debtors submit that
one of the subsections of Bankruptcy Code section 363(f)
applies, and that any such Interest will be adequately
protected by having it attach to the net proceeds of the
sale, subject to any claims and defenses the Debtors may
possess with respect thereto.

54.    Accordingly, the sale should be approved
under Bankruptcy Code section 363(f).

**D.    The Debtors' Request for Relief from Transfer Taxes
Under Bankruptcy Code Section 1146(c) Should Be
Granted.**

55. Bankruptcy Code section 1146(c) provides that "the making or delivery of an instrument of transfer under a Plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." This language has been construed to include transfers pursuant to a sale outside of, but in furtherance of, effectuating a reorganization plan. See In re Hechinger Inv. Co., 254 B.R. 306, 317 (Bankr. D. Del. 2000) (holding that Bankruptcy Code section 1146(c) requires only that a plan ultimately be confirmed); see also In re Jacoby-Bender, Inc., 758 F.2d 840, 842 (2d Cir. 1985) (holding that Bankruptcy Code section 1146(c) applies when the "transfer is necessary to the consumma-tion of a plan"); In re United Press Int'l, Inc., Case No. 91-B-13955 (FSC), 1992 Bankr. LEXIS 842 at *4 (Bankr. S.D.N.Y., May 18, 1992) (Section 1146(c) exemption ap-plied to section 363 sale where "value of debtor's assets . . . likely to deteriorate [during] time necessary to . . . confirm a plan.").

56. The Debtors are seeking this Court's approval of the sale to reduce their secured indebtedness and thereby facilitate the formulation and ultimate confirmation of a reorganization plan that will yield the highest possible returns to the Debtors' creditors. In

light of the foregoing, the Debtors respectfully submit
that the sale is a necessary step toward a reorganization
plan and, accordingly, should be exempt from stamp tax or
similar taxes under Bankruptcy Code section 1146(c).

57.  More importantly, if the sale of the
Assets is not accomplished now, the value of the Assets
will deteriorate.  Merely because a plan could not be
confirmed in time to prevent deterioration, the Debtors
should not be deprived of the benefits of Bankruptcy Code
section 1146(c).

**E.    The Assumption and Assignment of Executory
        Contracts and Unexpired Leases Should Be Authorized.**

58.  Section 365(f)(2) of the Bankruptcy Code
provides, in pertinent part, that:

> The trustee may assign an executory contract
> or unexpired lease of the debtor only if --
>
>> (A)   the trustee assumes such con-
>> tract or lease in accordance with the
>> provisions of this section; and
>>
>> (B)   adequate assurance of future
>> performance by the assignee of such con-
>> tract or lease is provided, whether or not
>> there has been a default in such contract
>> or lease.

11 U.S.C. § 365(f)(2).  Under Bankruptcy Code section
365(a), a debtor, "subject to the court's approval, may
assume or reject any executory contract or unexpired
lease of the debtor."  11 U.S.C. § 365(a).  Bankruptcy

36

Code section 365(b)(1), in turn, codifies the require-
ments for assuming an unexpired lease or executory con-
tract of a debtor.  This subsection provides:

> (b)  (1)   If there has been a default in
> an executory contract or unexpired lease of the
> debtor, the trustee may not assume such con-
> tract or lease unless, at the time of assump-
> tion of such contract or lease, the trustee -
>
>> (A)  cures, or provides adequate
>> assurance that the trustee will promptly
>> cure, such default;
>>
>> (B)  compensates, or provides ade-
>> quate assurance that the trustee will
>> promptly compensate, a party other than
>> the debtor to such contract or lease, for
>> any actual pecuniary loss to such party
>> resulting from such default; and
>>
>> (C)  provides adequate assurance of
>> future performance under such contract or
>> lease.

11 U.S.C. § 365(b)(1).

59.  The meaning of "adequate assurance of
future performance" depends on the facts and circumstanc-
es of each case, but should be given "practical,
pragmatic construction." EBG Midtown South Corp. v.
McLaren/Hart Env. Engineering Corp. (In re Sanshoe World-
wide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); see In re
Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D.
Fla. 1994)  ("[a]lthough no single solution will satisfy
every case, the required assurance will fall considerably

short of an absolute guarantee of performance"); <u>Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)</u>, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

60.   Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.   <u>See, e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

61.   As set forth in the Agreement, to the extent any defaults exist under any executory contract or unexpired lease that is assumed and assigned, Shaw or Successful Bidder will cure any such default in connection with the assumption and assignment.

62.   Moreover, the Debtors will adduce facts at the Sale Hearing to show the financial wherewithal of either Shaw or the Successful Bidder, experience in the industry, and willingness and ability to perform under the contracts to be assumed and assigned to it.

63.    The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of Shaw or the Successful Bidder to provide adequate assurance of future performance under the contracts to be assumed, as required under Bankruptcy Code section 365(b)(1)(C).  The Court should therefore authorize the Debtors to assume and assign contracts as forth herein.

### CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form attached hereto as Exhibit A approving (a) the Bidding Procedures; (b) the Bidding Protections; and (c) the form of the Notice of Auction and Sale Hearing.  In addition, at the Sale Hearing, the Debtors respectfully request that this Court enter an order substantially in the form attached hereto as Exhibit B (a) approving the Agreement; (b) authorizing the Debtors to (i) sell the Assets free and clear of all liens, claims and encumbrances; and (ii)

assume and assign the Assumed Contracts; and (c) granting
such other and further relief as is just and proper.

Dated:    Wilmington, Delaware
          January 25, 2002

                        David S. Kurtz
                        Timothy R. Pohl
                        Chris L. Dickerson
                        SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM (ILLINOIS)
                        333 West Wacker Drive
                        Chicago, Illinois 60606
                        (312) 407-0700

                            - and -


                          /s/ Gary A. Rubin
                        Gregg M. Galardi (I.D. No. 2991)
                        Marion M. Quirk (I.D. No. 4036)
                        Gary A. Rubin (I.D. No. 4041)
                        SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP
                        One Rodney Square
                        P.O. Box 636
                        Wilmington, Delaware 19899
                        (302) 651-3000

                        Attorneys for Debtors and
                          Debtors-in-Possession