# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| The IT Group, Inc., et al. | Case No. 02-10118 (MFW) |
| Debtors. | Jointly Administered |

## MOTION OF NORTHROP GRUMMAN TECHNICAL SERVICES, INC. AND WACKENHUT SERVICES, INC, FOR AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

Northrop Grumman Technical Services, Inc. ("Northrop") and Wackenhut Services, Inc. ("Wackenhut") (referred to collectively herein as the "Movants") hereby move pursuant to Section 362 of the U.S. Bankruptcy Code (the "Code"), 11 U.S.C. § 362, for the entry of an order granting relief from the automatic stay to permit the Movants to exercise their buy-out rights under a limited liability company ("LLC") operating agreement to which IT Environmental and Facilities, Inc. (the "Debtor") is a member.

As set forth more fully below, the Debtor is precluded by the express language § 365(c)(1)(A) of the Code from either assuming or assigning the operating agreement because (1) it is an executory contract, (2) it is not assignable under applicable nonbankruptcy law, and (3) the Movants do not consent to its assignment. The operating agreement contains an anti-assignment clause and a provision (often referred to as an "ipso facto" clause) authorizing the movants to terminate the Debtor's rights in the agreement upon the Debtor's filing of bankruptcy. Although anti-assignment and ipso facto clauses are not generally enforceable in bankruptcy, the provisions in the operating agreement between the Movants and Debtor in this case are enforceable because the Delaware Limited Liability Company Act, which governs the agreement, excuses the Movants from accepting performance from an entity other than the Debtor. Therefore, the Debtor has no legally cognizable interest in the agreement, and relief from stay is appropriate so that the Movants can exercise their rights under the agreement.

Specifically, the Movants seek to exercise their right to purchase their proportionate share of the Debtor's membership interest in the LLC which will result in a payment to the Debtor's estate of approximately $3,892,942.10.

The Movants bring this matter to the Court at this early juncture in the case because the Debtor has indicated that it intends to attempt to sell substantially all of its assets to a third party, which would include assuming and assigning the operating agreement between the Debtor and the Movants.

## I.        JURISDICTION

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## II.       BACKGROUND

### A.        The Operating Agreement

The Debtor and Movants comprise all of the members of Space Gateway Support, LLC ("Space Gateway"), a closely-held, Delaware limited liability company formed for the purpose of performing a U.S. government contract. The rights and obligations of the members of Space Gateway are set forth in the Operating Agreement of Space Gateway Support, LLC by and among Northrop, Wackenhut and Debtor (the "Operating Agreement").  (Declaration of William Carty In Support of Motion for Relief From Stay ("Carty Dec."), ¶ 3, Ex. 1).  Under Article 4.4, the members of Space Gateway are required to make certain periodic capital contributions necessary to perform the government contract.  (Carty Dec., ¶ 3, Ex. 1).

The following provisions of the Operating Agreement are particularly relevant here:

Article 4.10(a) provides the events of default under the Operating Agreement, which include, *inter alia*, the failure to make the required capital contributions (Article 4.10(a)(i)) and filing for bankruptcy protection (Article 4.10(a)(v)). (Carty Dec., ¶ 3, Ex. 1).

Article 4.10(c) gives the non-defaulting members the right to subscribe for some or all of their proportionate share of the defaulting member's shares at a per share price equal to the

capital account attributable to a share of the defaulting member. Non-defaulting members who desire to exercise their subscription right are required to deliver to all members, within 10 days after the issuance of the notice of default, a subscription notice stating the number of shares for which they are subscribing. (Carty Dec., ¶ 3, Ex. 1).

Article 10.1 prohibits a member from making any transfer of its rights under the Operating Agreement unless several conditions are satisfied, including, *inter alia*, that (1) the transfer have been approved by all of the members, and (2) except in the case of a transfer to an affiliate, the transferor complies with the provisions of Article 11 (right of first refusal). It further provides that the other members' "approval may be withheld in their sole discretion." (Carty Dec., ¶ 3, Ex. 1).

Finally, under Article 11, except in the case of a sale to an affiliate, if a member receives an offer for its shares, the other members have the right of first refusal to purchase their proportionate share of the shares covered by the offer. (Carty Dec., ¶ 3, Ex. 1).

### B. The Debtor's Default Under the Operating Agreement

On January 9, 2002, the Debtor failed to make a required capital contribution of $744,156.62, a request for which it had received on January 4, 2002. (Carty Dec., ¶ 10); (Declaration of James Long In Support Of Motion For Relief From Stay ("Long Dec."), ¶ 7). On January 11, 2002, pursuant to Article 4.10(d), Space Gateway gave the Debtor written notice that the Debtor would be in default of the Operating Agreement if the capital contribution was not made by close of business on January 18, 2002. (Carty Dec., ¶ 10, Ex. 2). The Debtor failed to make the capital contribution by the specified deadline. (Carty Dec., ¶ 10). In the interim, on January 16, 2002, The IT Group, Inc. ("IT Group") and 69 of its subsidiaries and affiliates, including the Debtor, filed petitions for reorganization under chapter 11 of the Code in this Court.

On the same day as the petitions were filed, The Shaw Group Inc. ("Shaw") and IT Group announced that Shaw had signed a letter of intent to acquire substantially all of the assets

and business of IT Group for approximately $105 million and the assumption of certain debts. (Carty Dec., ¶ 11). The IT Group subsequently filed a motion, dated January 25, 2002, seeking, in relevant part, approval of procedures for the assumption and assignment of the IT Group's executory contracts, including presumably the Operating Agreement, and the sale of all the IT Group's assets. The IT Group's motion is currently set for hearing before this Court on February 12, 2002.[1]

Failing to make a capital contribution within 7 days after receipt of notice and filing a voluntary petition for reorganization are both "events of default" under Article 4.10(a) of the Operating Agreement. (Carty Dec., ¶ 3, Ex. 1). Article 4.10(b) gives any non-defaulting member the right to issue a default notice to the defaulting member. (Carty Dec., ¶ 3, Ex. 1). Accordingly, immediately after the close of business on January 18, 2002, the Movants transmitted to the Debtor a notice of default, citing both the Debtor's failure to make the required capital contribution and the bankruptcy petition. (Carty Dec., ¶ 12, Ex. 4).

On January 21, 2002, the Movants met and agreed that, pursuant to Article 4.10(c), they would purchase their proportionate shares of the Debtor's membership interest. (Carty Dec., ¶ 15); (Long Dec., ¶ 9). The Movants will not consent to the Debtor assuming or assigning its interests under the Operating Agreement. (Carty Dec., ¶ 16); (Long Dec., ¶ 10). On January 22 and 25, 2002, pursuant to Article 4.10(e), the Movants gave the Debtor written notice of their intent to purchase the proportionate shares of the Debtor's membership interest. (Carty Dec., ¶ 15, Ex. 5); (Long Dec., ¶ 9, Ex. 1). The Movants seek relief from stay to exercise that right and

---

[1] The IT Group's motion is titled Motion for Order (I) Approving (A) Asset Purchase Agreement for Sale of Substantially All of the Assets of the Debtors' Business, (B) Bidding Procedures in Connection with the Sale and (C) Break-Up Fee and Expense Reimbursement in Connection Therewith, (II) Authorizing Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (III) Determining That Such Sale is Exempt From Any Stamp, Transfer, Recording, or Similar Tax, (IV) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (V) Granting Related Relief (the "Sale Motion"). To the extent necessary, the Movants object to any effort by the IT Group or the Debtor in the Sale Motion to obtain this Court's approval to assume or assign the Debtor's interest in Space Gateway under the Operating Agreement. The Movants' objection is based, in part, on the arguments included in the present Motion. The Movants intend to file a formal objection to the Debtor's assumption or assignment of the Debtor's interest in Space Gateway under the Operating Agreement when the Movants receive formal notice of the Debtor's request to assume and assign.

intend to pay the Debtor approximately $3.9 million for the Debtor's shares.  (Carty Dec., ¶ 16); (Long Dec., ¶ 10).

### III.        ARGUMENT

#### A.        The Automatic Stay

Section 362(d)(1) of the Code provides that:

> (d)        On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as terminating, annulling, modifying, or conditioning such stay –
>
> > (1)        for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362 (d)(1)

"Cause" is not defined by the Code.  Consequently, the Court must decide on a case-by-case basis what constitutes cause to lift the automatic stay.  *In re MacDonald*, 755 F.2d 715, 717 (9th Cir. 1986)  *In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)  Although the Movants have the initial burden to establish a prima facie case that "cause" exists for relief from the stay, under § 362(g), the Debtor "has the burden of proof on all other issues" to show that relief from stay is not warranted.  11 U.S.C. §362(g) *see In re RCM Global Long Term Capital Appreciation Fund*, 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996) *In re Rexene*, 141 B.R. at 577.

In a case remarkably similar to the present one, the Third Circuit in *In re West Elecs. Inc.*, 852 F.2d 79 (3d Cir. 1988) reversed the bankruptcy court and district court orders denying relief from the automatic stay and remanded the case with instructions that the stay be lifted to permit the government to terminate a contract with the debtor because the debtor could not assume and assign the contract without the government's consent, which the government was unwilling to give.  In so holding, the Third Circuit stated:

> The bankruptcy court was, therefore, confronted with a situation in which the debtor in possession was not entitled to assume the contract without the government's consent and the government was unwilling to give that consent.  In

that situation, the debtor in possession did not have a legally cognizable interest in the contract and it was an abuse of discretion for the court to decline to lift the stay.

*Id.* at 83-84.

As explained below, the Debtor's efforts to assume or assign the Operating Agreement in this case are just as futile as they were in *In re West Elecs.* Accordingly, relief from the stay is appropriate.

**B.      The Debtor Can Neither Assume Nor Assign the Operating Agreement**

Under traditional bankruptcy analysis, § 365 of the Code gives the debtor the authority to assume, assign, or reject the executory contracts of the debtor, notwithstanding any contract provisions appearing in the contract. If the contract is assumed, the debtor must cure the outstanding balance (*i.e.*, bring the payments current), provide adequate assurance of future performance and then is free to continue performing under the contract or may assign the contract to a third party, notwithstanding any ipso facto or anti-assignment clauses in the contract. 11 U.S.C. § 365(e) and (f).

However, the debtor's right to either assume or assign an executory contract is expressly limited by § 365(c)   Section 365(f)(1) is qualified at the outset with the language, "Except as provided in subsection (c) of this section:"

> *Except as provided in subsection (c) of this section*, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease …
>
> (2)(A) [if] the trustee assumes such contract or lease … and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided….

11 U.S.C. § 365(f) (1)-(2) (emphasis added).

Section 365(c), in turn, provides that the trustee or debtor cannot assume or assign a contract if under applicable non-bankruptcy law the other party to the contract would not be

required to accept performance from a party other than the debtor, and the other party does not consent to such assumption or assignment. Section 365(c) provides that:

> The trustee may *not* assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if –
>
> (1)(A) *applicable law* excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment;

11 U.S.C. § 365(c) (1) (emphasis added).

As the courts have noted, "[w]hat § 365(f) appears to give [*i.e.*, the right to assume and assign contracts notwithstanding law prohibiting such], § 365(c) seems to take away [*i.e.*, by stating that the debtor's right to assume or assign is subject to the law regarding acceptance of performance from non-debtor entities]." *In re Antonelli*, 148 B.R. 443, 447 (D. Md. 1992), *aff'd without citable opinion*, 1993 U.S. App. LEXIS 21529 (4th Cir. 1993).

In reconciling these provisions, the U.S. Court of Appeals for the Third Circuit has joined other courts in applying what is commonly referred to the "hypothetical test"[2] and enforcing the literal language of § 365(c) to bar assignment when the applicable law excuses a party from accepting performance from an entity other than the debtor, particularly in the area of partnership agreements and intellectual property licenses. *See In re West Elecs. Inc.*, 852 F.2d 79 (3d Cir. 1988) (granting relief from stay to government to terminate contract on grounds that debtor could not assume it under applicable non-bankruptcy law); *see also Cinicola v. Scharffenberger,* 248 F.3d 110, 121 (3d Cir. 2001) (noting in dicta that "if a contract could not be assigned under

---

[2] The "hypothetical test" is so named because under the analysis, the debtor is not permitted to assume the executory contract if under the applicable law the debtor could not assign it to a *hypothetical* third party without the consent of the other contracting party, even where the debtor has no intention of assigning the contract to any third party. *See In re Catapult Entertainment, Inc.,* 165 F.3d 747, 750 (9th Cir. 1999), *cert. dismissed,* 1999 U.S. LEXIS 6906 (1999).

applicable law, it may not be assumed or assigned by the trustee"); *In re Watts*, 876 F.2d 1090 (3d Cir. 1989) (barring assumption of contract to make loan and enforcing ipso facto clause under analogous language under 11 U.S.C. § 365(e)(2)(B)); *In re Schick*, 1999 Bankr. LEXIS 733 (Bankr. S.D.N.Y. 1999) (barring assumption and assignment of partnership agreement).

Indeed, this Court recently addressed the same issue in *In re Access Beyond Techs., Inc.,* 237 B.R. 32 (Bankr. D. Del. 1999)  Applying the hypothetical test in *Access Beyond Techs.,* this Court denied the debtor's motion for approval of a sale of certain assets including rights under a patent cross license, concluding that under § 365(c) the debtor did not have the right to assume and assign the license agreement because the other party to the agreement did not consent to its assignment.

The decision in *In re Catron*, 158 B.R. 629 (E.D. Va. 1993), *aff'd without opinion*, 25 F.3d 1038 (4th Cir. 1994) is closely analogous to the facts in the present case.  In *Catron*, the debtor twice failed prepetition to make required capital contributions to a partnership.  When the debtor filed its bankruptcy petition under chapter 11 certain ipso facto buy-out options were triggered in the partnership agreement.  The U. S. District Court for the Eastern District of Virginia, citing the Third Circuit's decision in *In re West*, affirmed the bankruptcy court's order granting relief from the automatic stay to exercise the buy-out option, concluding that under Virginia partnership law, partners were required to accept performance from and render performance to only their fellow partners, and no person could become a member of the partnership without the consent of all partners.

Thus, under the circumstances present here, the literal language of § 365(c) permits the non-debtor contracting parties (*i.e.*, the Movants), by withholding consent, to prevent the Debtor from either assuming the contract for the Debtor's own use or assigning it to a third party.

### 1.     The Operating Agreement is Executory

The Movants do not believe there can be any dispute that the Operating Agreement is an executory contract.  *See In re Catron*, 158 B.R. 624, 626 (Bankr. E.D. Va. 1992) (holding

partnership agreement is executory contract), *aff'd*, 158 B.R. 629 (E.D. Va. 1993), *aff'd without opinion*, 25 F.3d 1038 (4th Cir. 1994). Space Gateway has continuing obligations to perform under its government contract, and the members, far from being passive investors, have continuing obligations under the Operating Agreement such that failure of any of the members to complete performance would constitute a material breach. (Carty Dec., ¶¶ 3-14, Ex. 1); (Long Dec., ¶¶ 3-8); *see also Access Beyond Techs.*, 237 B.R. at 43 (contract is executory where there is performance due on both sides).

### 2. The Applicable Non-Bankruptcy Law Excuses Movants from Accepting Performance from a Third Party

In order to determine whether the applicable law bars assumption and assignment, the courts look to whether the applicable non-bankruptcy law (either by statute or by case precedent) makes a contract nonassignable because the identity of the third party is material (referred to as the "materiality of identity test"), meaning that a party is excused from accepting performance from an entity other than the other original party. *See In re Catapult Entertainment, Inc.*, 165 F.3d 747, 754-55 (9th Cir.), *cert. dismissed,* 1999 U.S. LEXIS 6906 (1999); *In re Catron,* 158 B.R. at 639.

The Operating Agreement provides under Article 19.4 that Delaware law shall control disputes under the agreement. Under Delaware law, limited liability companies like Space Gateway are analogous to partnerships insofar as the members' relations with each other. Indeed, the Delaware LLC law was modeled on the Delaware partnership law and many of its provisions are substantially the same. *See Elf Atochem North America, Inc.*, 727 A.2d 286, 290 (Del. 1999). Just as is true with respect to partnerships, a member's interest in an LLC is personal property. *Compare* 6 Del. C. § 15-502 ("A partnership interest is personal property."); *with* 6 Del. C. § 18-701 ("A limited liability company interest is personal property.") Absent a provision to the contrary in the LLC operating agreement, a person cannot become a member of the LLC without the consent of all of the members. *See* 6 Del. C. § 18-301(b) And, just as is true with respect to partnerships, unless the operating agreement otherwise provides, the transfer

of a member's economic interest does not entitle the transferee to membership in the LLC. *Compare* 6 Del C. § 15-803(a)(3) (transfer of partner's economic interest "does not entitle the transferee to participate in the management or conduct of the partnership business or affairs"); *with* 6 Del. C. § 18-702(b)(1) ("An assignment of a limited liability company interest does not entitle the assignee to become or exercise any rights or powers of a member.") Moreover, for both LLCs and partnerships, the Delaware Code itself contains an ipso facto provision terminating the agreement upon filing of bankruptcy. *See* 6 Del. C. § 18-304(1)(b) (unless otherwise provided in the LLC agreement, a person ceases to be a member of a LLC upon filing a voluntary petition in bankruptcy); 6 Del. C. § 15-601(6)(b) (a partner is dissociated from a partnership upon filing a voluntary petition in bankruptcy).

In applying substantially similar provisions under state partnership law, courts have consistently found that partnerships are nonassignable. *See, e.g.*, *In re Catron*, 158 B.R. at 634-35 (§ 365(c)(1)(A) precludes assumption of partnership agreement because under Virginia partnership law, transfer of partner's interest does not entitle assignee "to interfere in the management or administration of the partnership business or affairs," and "[n]o person can become a member of a partnership without the consent of all the partners."); *In re Manor Place Development Assocs.*, 144 B.R. 679 (Bankr. D.N.J. 1992) (same result under New Jersey partnership law).

Accordingly, the Code's bar on the enforcement of anti-assignment clause is inapplicable here, and thus Article 10.1 of the Operating Agreement prohibiting assignment of the Debtor's rights in the Operating Agreement without approval by all of the members – *i.e.*, the Movants – is enforceable.

### 3.      Movants Do Not Consent to Assignment

The Movants have stated in the Declarations of William Carty and James L. Long, filed herewith, that they do not consent to the Debtor assuming or assigning its interests under the Operating Agreement. (Carty Dec., ¶ 16); (Long Dec., ¶ 10). As noted above, Article 10.1(a) of

the Operating Agreement provides that the Movants may withhold approval for the transfer "in their sole discretion."  (Carty Dec., ¶ 3, Ex. 1).

Although not necessary, the Movants' Declarations nonetheless establish the reasonableness of their refusal to consent to the assignment.  Space Gateway was formed for the sole purpose of performing a U.S. government contract.  (Carty Dec., ¶ 4).  The contract, known as the Joint Base Operations Contract ("JBOSC") is a cost-plus-award-fee contract with a five year option exercisable at the government's discretion.  (Carty Dec., ¶¶ 4-5).  A cost-plus-award-fee contract is a cost reimbursement contract that provides for a fee consisting of (1) a base amount, which may be zero, as it is for the JBOSC, and (2) an award amount, based on a judgmental evaluation by the government, which is designed to provide motivation for excellence in contract performance.  (Carty Dec., ¶ 5).  Hence, the government's perception of Space Gateway's performance of the contract directly influences the amount of fees Space Gateway will earn under the contract as well as the government's decision whether to exercise the option.

Given the Debtor's historical performance under the Operating Agreement, the Movants believe the assumption or assignment of Debtor's interest would have a significant risk of being disruptive, which could threaten both the amount of the fee awarded by the government and Space Gateway's prospects for future work under the option.  (Carty Dec., ¶¶ 6-14); (Long Dec., ¶¶ 5-8).  The Movants believe it is in Space Gateway's interest to quickly resolve this issue, acquire Debtor's interest, and focus on performing the contract.  (Carty Dec., ¶ 14); (Long Dec., ¶ 8).  The government customer is supportive of the Movants' intent to acquire Debtor's interest in the Operating Agreement.  (Carty Dec., ¶ 14); (Long Dec., ¶ 8). .  For all of those reasons, the Movants do not consent to Debtor's assumption or assignment of the Operating Agreement.  (Carty Dec., ¶ 16); (Long Dec., ¶ 10).

Therefore, because (1) the Operating Agreement is executory and expressly precludes assignment without Movants' approval, (2) applicable law excuses Movants from accepting performance from a third party, and (3) Movants do not consent to the assumption or assignment,

Debtor is barred by § 365(c) from either assuming or assigning the Operating Agreement.

Accordingly, any attempt by the Debtor to assume the Operating Agreement is futile, and relief

from the stay is appropriate to permit the Movants to exercise their rights to buy out the Debtor's

rights under the Operating Agreement.

### C.  The Ipso Facto Clause is Enforceable

The Operating Agreement's ipso facto clause is similarly enforceable in these

circumstances.  Under 11 U.S.C. § 365(e) (1), ipso facto clauses are void, "notwithstanding …

applicable law":

> *Notwithstanding* a provision in an executory contract or unexpired lease,
> or in *applicable law*, an executory contract or unexpired lease of the
> debtor may not be terminated or modified, and any right or obligation
> under such contract or lease may not be terminated or modified, at any
> time after the commencement of the case solely because of a provision in
> such contract or lease that is conditioned on –
> (A) the insolvency or financial condition of the debtor at any time before
> the closing of the case;
> (B) the commencement of a case under this title; or
> (C) the appointment of or taking possession by a trustee in a case under
> this title….

11 U.S.C. § 365(e) (1).  However, 11 U.S.C. § 365(e)(2)(A), using language virtually identical to

that of § 365(c), provides that:

> Paragraph (1) of this subsection [365(e)] does not apply to an executory
> contract or unexpired lease of the debtor, whether or not such contract or
> lease prohibits or restricts assignment of rights or delegation of duties, if –
> (A)(i) *applicable law* excuses a party, other than the debtor, to such
> contract or lease from accepting performance from or rendering
> performance to the trustee or to an assignee of such contract or lease,
> whether or not such contract or lease prohibits or restricts assignment of
> rights or delegation of duties; and
> (ii) such party does not consent to such assumption or assignment….

11 U.S.C. § 365(e) (2) (emphasis added).

Thus, just as with the anti-assignment clause, the effect of the literal language under §

365(e)(2)(A) is to permit the enforcement of the ipso facto clause in the Operating Agreement by

the Movants if, under applicable law, the Movants could prevent the Debtor's assignment of the

contract Operating Agreement, whether the Debtor intends to assign the contract or not. *See In re Catron,* 158 B.R. at 634-35 (enforcing ipso facto clause in partnership agreement); *see also In re Catapult,* 165 F.3d at 753 n.6 (in *dicta* stating that "§ 365(e)(2)(A) expressly revives 'ipso facto' clauses in precisely the same executory contracts that fall with the scope of § 365(c)(1)"). As discussed above, Delaware law excuses Movants from accepting performance from a third party, and the Movants do not consent to the assumption or assignment of the Operating Agreement. (Carty Dec., ¶ 16); (Long Dec., ¶ 10). Accordingly, the ipso facto clause in the Operating Agreement is enforceable.

The ipso facto clause under Article 4.10(a)(v) of the Operating Agreement provides that the Debtor is in default of the Operating Agreement under Article 4.10(a)(v) due to its filing for bankruptcy protection. (Carty Dec., ¶ 3, Ex. 1). Consequently, pursuant to Article 4.10(c) the Movants have the right to subscribe for some or all of their proportionate share of the Debtor's membership interest in Space Gateway. (Carty Dec., ¶ 3, Ex. 1). At the very least, under Article 11 of the Operating Agreement, the Movants are entitled to exercise their right of first refusal to purchase their proportionate share of the shares covered by an offer to the Debtor. (Carty Dec., ¶ 3, Ex. 1). The Court should lift the automatic stay to permit the Movants to exercise these rights under the Operating Agreement.

In sum, as the Third Circuit concluded in *In re West Elecs.*, Debtor does not have any cognizable interest in the Operating Agreement, and relief from stay is appropriate to permit the Movants to enforce their rights under the Operating Agreement. The Movants note that, unlike the ordinary situation in which the non-debtor party is seeking to terminate the agreement without giving any consideration to the Debtor, the Movants here are going to pay the Debtor a fair price for its rights in Space Gateway – at a price per share equal to the capital account attributable to Debtor's share (or roughly $3.9 million) as provided in Article 4.10(c) of the Operating Agreement. (Carty Dec., ¶ 16); (Long Dec., ¶ 10).

## IV.    CONCLUSION

For all the foregoing reasons, the Motion should be granted and the automatic stay should

lifted to permit the Movants to exercise their rights under the Operating Agreement.

POTTER ANDERSON & CORROON LLP


By:____/s/ Laurie Selber Silverstein_____
        Laurie Selber Silverstein (#2396)
        Hercules Plaza, 6th floor
        1313 N. Market Street
        Wilmington, DE  19899-0951

Of Counsel:

Karen L. Manos (D.C. Bar No. 411451)
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202.383.7472
Facsimile: 202.383.6610

Buckmaster de Wolf (CA Bar No. 195536)
HOWREY SIMON ARNOLD & WHITE, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025
Telephone:  650.463.8100
Facsimile:  650.463.8400

        Attorneys for Movants
        NORTHROP GRUMMAN
        TECHNICAL SERVICES, INC.
        and
        WACKENHUT SERVICES, INC.,

Dated:  February 11, 2002

PA&C-508504