|     |     |
| --- | --- |
| **UNITED STATES BANKRUPTCY COURT** <br> **DISTRICT OF DELAWARE** | |
| In re: <br><br> THE IT GROUP, INC., *et al*. <br><br> Debtors. | Chapter 11 <br><br> Case No: 02-10118 (MFW) <br><br> Jointly Administered <br><br> <u>Relates to Motion at Docket #86</u> <br><br> Date: April 19, 2002 <br> Time: 11:30 a.m. <br> Place: United States Bankruptcy Court <br> 824 Market Street <br> 6th Floor <br> Courtroom 1 <br> Wilmington, Delaware 19801 |

**<u>LIMITED/CONDITIONAL OBJECTION OF SHELLEY BOOKSPAN TO MOTION FOR ORDER (I) APPROVING (A) ASSET PURCHASE AGREEMENT FOR SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS' BUSINESS, (B) BIDDING PROCEDURES IN CONNECTION WITH THE SALE AND (C) BREAK-UP FEE AND EXPENSE REIMBURSEMENT IN CONNECTION THEREWITH, (II) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (III) DETERMINING THAT SUCH SALE IS EXEMPT FROM ANY STAMP, TRANSFER, RECORDING, OR SIMILAR TAX, (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (V) GRANTING RELATED RELIEF—DOCKET # 86</u>**

Shelley Bookspan ("Ms. Bookspan"), a creditor, party-in-interest, and former officer of PHR Environmental Consultants, Inc., an affiliate of the above-Debtors (Case No. 02-10150), hereby objects (the "Objection") on a limited basis to the motion filed by the above-debtors captioned: "Motion For Order (I) Approving (A) Asset Purchase Agreement For Sale Of Substantially All Of The Assets Of The Debtors' Business, (B) Bidding Procedures In Connection With The Sale And (C) Break-Up Fee And Expense Reimbursement In Connection Therewith, (Ii) Authorizing Sale Of Assets Free And Clear Of Liens, Claims, Encumbrances, And Interests, (Iii) Determining That Such Sale Is Exempt From Any Stamp, Transfer, Recording, Or Similar Tax, (Iv) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired

Leases, And (V) Granting Related Relief" (the "Sale Motion"). In support of this Objection, Ms. Bookspan states as follows:

## SUMMARY

Shelley Bookspan is a former employee of an affiliate of the Debtors, PHR Environmental Consultants, Inc ("PHR"). While providing services solely to PHR from mid-1997 through 1999, Ms. Bookspan participated in the IT Group's' "unfunded" deferred-compensation plan (the "Plan"). Pursuant to the Plan, Ms. Bookspan deferred approximately <u>90%</u> of her gross salary/bonuses from the IT Group for the two year period. She is owed $429,108.68 in back wages/bonuses. The Debtors counsel asserts that the Debtors' bankruptcy cases may be "administratively insolvent," meaning that if Ms. Bookspan simply filed a proof of claim, she may receive zero (-0-) distribution from the bankruptcy estate on account of her $429,108.68 in back wages/bonuses. Ms. Bookspan believes such an outcome would be an outrage, tantamount to an involuntary servitude for the two-year period.

The Debtors alleged generally that the Plan was never funded. Ms. Bookspan requested confirmation of this claim through discovery, which was agreed to by the Debtors. Ms. Bookspan wanted to find out whether there is a trust "*res*" which arguably is not part of the bankruptcy estate under 11 U.S.C. § 541(d) and not subject to the pending sale; and whether the deferred-compensation obligations arising to her, or to similarly situated claimants, had possibly been funded through an escrow account, bank account, payroll account, or functionally equivalent account; or whether the Debtors made accounting entries restricting assets; or whether fund assets have been transferred to DIP operating accounts.

There are several problems with the Debtors' discovery responses. The Debtors delayed providing verified responses for about two weeks—which were only received three days ago, on

**2**

Monday, April 8, 2002. Their interrogatory responses that the "Trust and/or the Plan" were not funded do not address certain narrow issues regarding financial activity that may have occurred between November 1, 2001 and the Petition Date: whether funds-transfers were made to bank accounts or escrow accounts; whether assets have been restricted or unrestricted or otherwise designated/set aside on the accounting records of the Trustee, Union Bank or the administrator (CRG), regardless of whether assets were physically transferred; or the balances, if any, of a particular account at Union Bank relating to the Plan (only a 1997 statement was provided); whether there are any accounts with the administrator (CRG) and, if so, whether they were funded. Ms. Bookspan will seek supplemental information/documents regarding the above-issues before the Sale Hearing pursuant to the usual meet-and-confer procedures for discovery.

Further, the Debtors have not yet provided requested written assurances that plan assets have <u>not</u> been commingled in DIP operating accounts.

Some of the discovery that was provided suggests there may be assets in a Trust *res*, which would have to be used for the exclusive benefit of beneficiaries pursuant to 29 U.S.C. § 1103(c). For example, a document from 1995 suggests that the Debtors "<u>fund account through a book reserve</u>." However, it is without dispute that the Debtors have <u>always</u> intended to "take back" any undistributed trust *res* that did exist in the event of the Debtors filing bankruptcy: paragraphs 1.3 and 3.7(b) of the Master Trust Agreement explicitly purport to make the assets of the Trust subject to the claims of Debtors' creditors in violation of ERISA, 29 U.S.C. § 1103(c). The Debtors' counsel has also said if the assets did exist, they would be subject to creditors' claims.

As noted, Ms. Bookspan will ask the Debtors to provide supplemental information/ discovery that, hopefully, will be provided before the sale hearing to the Shaw Group. Because of their delays, however, the supplemental requests could not be submitted to the Debtor's counsel before the deadline for preparing/filing this limited opposition.

**3**

Ms. Bookspan does not oppose, overall, the sale to the Shaw Group or to a successful overbidder. However, the Shaw Group is proposing to "buy" all of the Debtors' cash, wherever located. To protect Ms. Bookspan and other beneficiaries, Ms. Bookspan respectfully requests that language be inserted in any sale order which would prohibit the transfer of any cash accounts potentially related to deferred-compensation obligations, or related to accounts with respect to which restrictive accounting entries have been made, absent further order of the Bankruptcy Court.

If the Debtor is correct that no such accounts exist or that no restrictive accounting entries regarding a cash account were made, then such a provision in the order approving the sale will have no impact on the closing of the Debtors' sale to the Shaw Group or a successful overbidder.

## **FACTS**

1. Ms. Bookspan is a former majority stockholder of PHR. Ms. Bookspan sold PHR to the Debtors pursuant to an asset purchase agreement that closed in May 1997. After the sale, Ms. Bookspan was retained as an employee of the Debtors, specifically of the IT Group, Inc.

2. Prior to the PHR-sale, the Debtors had adopted, on January 1, 1996, an unfunded deferred compensation plan for officers and directors captioned "IT Corporation Deferred Compensation Plan" (the "Plan"). A copy of the Plan is attached to the accompanying declaration of Shelley Bookspan (the "Bookspan Dec.") at Exhibit "1."

3. The Debtors simultaneously adopted a master trust agreement captioned "IT Corporation Master Trust Agreement for Deferred Compensation Plans" (the "Master Trust Agreement"). A copy of the Master Trust Agreement is attached to the accompanying declaration of Thomas A. Johnson at Exhibit "1." (Johnson Dec., Ex. "1")

4. There were 11 participants when the Plan was first adopted in 1996, according to a letter from the Debtors' pension counsel. (See Johnson Dec., Ex. "2")

**4**

5. A copy of a "Question and Answers" booklet describing the Plan and distributed by the Debtors is attached to the Bookspan Declaration at Exhibit "2." (Bookspan Dec., Ex. "2") The Plan allows for "participants" to defer a portion of their wages tax-free and to maintain the deferred amount in an account. (*Id.*; Questions and Answers at 1, 3)

6. The Debtors claimed there were further advantages to the Plan. Amounts deferred were <u>not</u> included on the participant's personal income tax returns in the year deferred (*Id.*); and were not subject to Federal Income Tax withholding (*Id.*). Amounts deferred were only includable in the personal income tax returns in the year such amounts were actually withdrawn from the participant's Account. (*Id.*) Participants would earn deferred interest on the balance in the account. In 1997, the interest rate was Prime + 1%. (*Id.* at 3, 4)

7. Ms. Bookspan enrolled in the Plan two months after the PHR closing—on July 30, 1997, and re-enrolled in 1998 and 1999. (Bookspan Dec., Ex. "3" (3 enrollment forms))

8. As part of each enrollment, Ms. Bookspan elected to defer virtually all of her base salary (90% in 1997 and 1998; 85% in 1999) and 50% of year-end bonuses for all years. (*Id.*)

9. As of December 31, 2001, the Debtors owed Ms. Bookspan $388,333.65 in back wages/bonuses, and $40,775.03 in interest credited to her account, <u>for a total of $429,108.68</u>. A Benefit Statement for Ms. Bookspan's deferred-compensation account with the Debtors, is attached as Exhibit "4." (Bookspan Dec., Ex. "4")

10. Ms. Bookspan made demand on the Debtors for payment of the balance in her Account on November 7, 2001. Mike Pepperney, a Vice President and officer, confirmed by e-mail that Ms. Bookspan was "scheduled for payment" for approximately 85% of the Account balance (the total amount less an early-withdrawal penalty) on January 2, 2002. (Bookspan Dec., Ex. "5")

11. The Plan states that the it is subject to ERISA and California law:

        13.9    **Governing Law.**  Subject to ERISA, the provisions of this Plan shall be construed and interpreted according to the laws of the State of California.

(Bookspan Dec., Ex. 1; Plan at 19)

    12.    The Master Trust Agreement states that it is subject to ERISA and California law:

        10.6    Applicable Law.  Except to the extent, if any, preempted by ERISA, this Master Trust Agreement shall be governed by and construed in accordance with the laws of the State of California.  Any provision of this Master Trust Agreement prohibited by law shall be ineffective to the extent of any such prohibition, without invalidating the remaining provisions hereof.

(Johnson Dec., Ex. 1; Master Trust Agreement at 18)

    13.    The Employee Retirement Income Security Program (29 U.S.C. § 1000 *et seq.*; "ERISA"), states, with respect to benefit plans:

> "[T]he assets of a plan shall <u>never inure to the benefit of any employer</u> and <u>shall be held for the **exclusive** purposes of providing benefits to participants in the plan and their beneficiaries</u> . . . "

29 U.S.C. § 1103(c)(1).

    14.    The Master Trust Agreement contains provisions purporting to make the assets of the Trust subject to the claims of Debtors's creditors:

> "1.3    <u>Irrevocability; Creditor Claims</u>. . . . The Participants and their Beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.  Any rights created under the Plans and this Master Trust Agreement shall be mere unsecured contractual rights of the Participants and their Beneficiaries against the Company and the Subsidiaries.  Any assets held by the Trust will be **subject to the claims of the Company's and the Subsidiaries' general creditors** under federal and state law in the event of Insolvency (as defined below)."

(Johnson Dec., Ex. 1, Master Trust Agreement at 1, ¶ 1.3).

> "3.7(b) At all Times during the continuance of this Trust, . . ., the principal and income of the Trust **shall be subject to claims of the general creditors of the Company and its Subsidiaries** under federal and state law as set forth below . . ."

(Johnson Dec., Ex. 1, Master Trust Agreement at 10, ¶ 3.7) (*Compare* terms of the Plan, Exhibit 1 of the Bookspan Declaration, ¶ 13.1 at 18: "Any and all of an Employer's assets shall be, and remain, the general, unpledged and unrestricted assets of the Employer. . . .")

15. There are elaborate provisions in the Master Trust Agreement as to when the Trustee of the Master Trust Agreement is permitted to cease making payments to Plan-participants in the event of insolvency. (Johnson Dec. Ex. "1"; Master Trust Agreement ¶¶ 3.7(a), (b) and (c) at 9-10)

16. Post-petition, counsel for the Debtor informed that it appears the Debtors' bankruptcy cases may be "administratively insolvent." (Johnson Dec. ¶ 5)

*17.* When asked whether any trust *res* existed under the Trust, counsel for the Debtor stated that certain representatives from the Debtors informed her that the Plan and the Trust had never been funded; and that, even if there was funding, Ms. Bookspan's only recourse was to file a claim because such assets would be subject to the claims of the bankruptcy estate (Johnson Dec. ¶ 6), apparently a reference to the terms of the Plan and Trust cited above in paragraph 13.

18. Because counsel for the Debtor suggested that Ms. Bookspan may receive zero distribution on account of $429,108.68 in back-wages representing nearly two years worth of unpaid work—Ms. Bookspan requested, and the Debtors' counsel agreed, that the Debtors voluntarily provide Ms. Bookspan with documents and information under oath.

19. Ms. Bookspan sought to verify that no assets relating to deferred-compensation obligations of the Plan had been placed in a trust, an escrow account, a bank account or functional equivalent, or that assets had not otherwise been designated as restricted. If assets have been placed in trust, accounts, or so designated, such assets arguably would be assets of the Trust, and excluded

from the assets of the Debtor's bankruptcy estate. (Such exclusion would be pursuant to 11 U.S.C. § 541(d), and 29 U.S.C. § 1103(c)(1) (discussed below)).

20. Ms. Bookspan's Interrogatories and Request for Production of Documents are not attached as the requests themselves are reproduced in the Debtors' responses with the exception of Interrogatory No. 2, which was omitted entirely by the Debtors (making it difficult to determine to what question the Debtors were responding).

21. Some documentation provided by the Debtors suggests that the Debtors established a process for paying obligations arising under the Plan by making restrictive accounting entries. For example, some of the early documents cite as a feature of the proposed plan:

"<u>Company funds account through 'book reserve</u>.' "

(Johnson Dec. Ex. "3") (emph. added)

22. However, the discovery provided by the Debtors was incomplete. One Interrogatory was misquoted and there was no response at all to another Interrogatory. In addition, the Debtors' responses to the requests were unusual in certain respects. All of the discovery responses were about two-weeks late, as detailed in the accompanying declaration of Thomas A. Johnson. Copies of both responses are attached. (Johnson Dec. Exhs. 4 and 5)

23. The Debtor's Response to Interrogatories state that:

"No assets have been transferred to or from the Trust and/or the Plan

on account of obligations relating to deferred compensation."

(Johnson Dec. Ex. 4; Response to Interrogatories at 7, Response No. 8). The Debtors did not define "Trust" or "Plan" in their Response to Interrogatories. Consequently, it appears the Debtors may not have addressed whether transfers of funds were made to a bank account, escrow account, some other account for deferred-asset obligations; or whether deferred-compensation assets have been restricted or unrestricted, or otherwise designated/set aside.

**8**

24. Ms. Bookspan is hopeful that the Debtors will address several issues raised by Ms. Bookspan's discovery requests at or before the Sale Hearing. The undersigned will be addressing written meet-and-confer questions to the Debtors' counsel regarding the following issues which, hopefully, will be resolved before the Sale Hearing:

    a. Whether contributions were made to accounts controlled by Compensation Resource Group, Inc., the administrator for the Plan, between November 1, 2001 and the Petition Date.

    b. Whether there was, or currently is, a balance in the following bank account, and whether a balance was transferred/returned to a DIP account, between November 1, 2001 and the Petition Date: Union Bank of California, # 06359-00

    c. whether funds-transfers were made to bank accounts or escrow accounts; and whether assets have been restricted or unrestricted or otherwise designated/set aside on the accounting records of the Trustee, Union Bank or the administrator (CRG) between November 1, 2001 and the Petition Date, regardless of whether assets were physically transferred.

25. The Debtor's counsel has not yet responded to Ms. Bookspan's request for verification that no deferred-compensation assets have placed in debtor-in-possession ("DIP") operating accounts. (Johnson Dec. Ex. 6; Letter from T. Johnson to M. Cashman dated April 2, 2002, ¶ 4) Because federal tracing rules may limit a beneficiary's right to trace funds that had been held in trust but are commingled in another account (*see e.g., In re Dameron*, 155 F.3d 718 (4th Cir. 1998)), Ms. Bookspan sought to verify that no such transfers to DIP accounts had taken place. (Johnson Dec. ¶ 12) Hopefully these concerns will be addressed.

26. The Purchase and Sale Agreement with the Shaw Group states that the:

> "Buyer shall purchase from Sellers, the Assets . . . including the following . . .:
>     . . . .

**9**

(n) all Cash (other than the Cash Consideration and the
                    Employee Payments); . . .

(Purchase And Sale Agreement at 14)

27. Accordingly, if any cash account exists into which assets relating to deferred-compensation obligations have been deposited, such account would appear to be subject to transfer pursuant to the sale closing with the Shaw Group or, possibly, to a closing with the successful overbidder.

## **ARGUMENT**

**The Court Should Protect Ms. Bookspan Because of: (A) the Possibility Assets Were Set Aside and the Problems in Producing Discovery; (B) Congress' Statutory Mandate That Deferred Compensation Benefits Be Preserved For the Exclusive Benefit of Plan Beneficiaries/ Employees, and (C) The Irrevocable Prejudice Accruing to Ms. Bookspan If Plan Assets Are Inadvertently Transferred to A Buyer.**

**1. Plan Assets May Have Been Set Aside.**

The Debtors, like most large companies, meets payroll obligations on a bi-weekly or bi-monthly basis. (Bookspan Dec. ¶ 15) It cannot be denied that there are firm time deadlines in preparing payroll for a company the size of the Debtors. It would not be surprising if the Debtors moved assets or cash to a special payroll or escrow account to make deferred-compensation payments that were coming due; or if the Debtors made accounting entries restricting cash in their accounts in anticipation of making certain payments that would arise in the ordinary course of the payroll cycle. Here, Ms. Bookspan's made demand for payment-in-full of her Account on November 7, 2001, and was promised that her payment of $429,108.68 would be made January 2, 2002.

It would not be surprising that payroll personnel were informed at the last minute to withhold checks for deferred-benefit beneficiaries on account of the pending bankruptcy. However, if funds had been previously segregated from, or designated to be separate from, the Debtors'

general assets, such assets would arguably be property of the Plan/Trust. Ms. Bookspan will be requesting that the Debtors respond to these concerns as part of the meet-and-confer process regarding discovery disputes.

### 2. The Debtors Have Had Substantial Difficulties Responding to Discovery/Requests for Information.

As noted above, the Debtors had substantial problems producing discovery. Responses were generally provided two weeks late, only days before the deadline for filing objections to the sale to the Shaw Group. One interrogatory was misquoted, and there appears to have been no response at all to another. The Debtors' responses themselves may be limited in scope. The Debtors state:

> "No assets have been transferred to or from the Trust and/or the Plan on account of obligations relating to deferred compensation."

(Johnson Dec. Ex. 4; Response to Interrogatories at 7, Response No. 8). But the Debtors did not define "Trust" or "Plan" in their Responses. Consequently, it appears the Debtors may not have addressed whether transfers of funds were made to bank accounts, escrow accounts, some other account for deferred-asset obligations; or whether deferred-compensation assets have been restricted or unrestricted, or otherwise designated/set aside.

In addition, the Debtor's counsel has not yet responded to Ms. Bookspan's request for verification that no deferred-compensation assets have placed in debtor-in-possession ("DIP") operating accounts. (Johnson Dec. Ex. 6) As the Court is aware, federal tracing rules may limit a beneficiary's right to trace funds that had been held in trust but are commingled in another account (*see e.g., In re Dameron*, 155 F.3d 718 (4th Cir. 1998)). Ms. Bookspan sought to verify that no such transfers to DIP accounts had taken place.

As to the documents that were provided, one document suggests that the Debtors intended to make restrictive accounting entries when deferred-compensation obligations were scheduled for payment. (Johnson Dec. Ex. "3")  The Debtors' other discovery responses raise the following questions.

> 1. whether contributions were made to accounts controlled by Compensation Resource Group, Inc., a servicing agent for the Plan.
>
> 2. whether there was, or currently is, a balance in the following bank accounts, and whether a balance was transferred/returned to a DIP account: Union Bank of California, # 06359-00.
>
> 3. whether funds-transfers were made to bank accounts, escrow accounts—not just the "Trust and/or the Plan";
>
> 4. whether assets have been restricted or unrestricted or otherwise designated/set aside on the accounting records of the Trustee, Union Bank or the administrator (CRG) between November 1, 2001 and the Petition Date, regardless of whether assets were physically transferred

**3. Congress Intends That Deferred Compensation Assets Be Used For the Exclusive Benefit of the Beneficiaries.**

It is a fundamental rule that the bankruptcy estate only succeeds to the title and rights in the property that the debtor possessed.  When a debtor is in possession of property impressed with an express or constructive trust whose validity is recognized, the estate will generally hold such property subject to the outstanding interests of the beneficiaries.  11 U.S.C. § 541(d).[1]  Here, Ms. Bookspan holds a beneficial interest in Trust assets, if they exist, pursuant to the Master Trust

---

[1] *Gulf Petroleum, S.A. v. Collazo*, 316 F.2d 257 (1st Cir. 1983); *In re Shurtleff*, 778 F.2d 1416 (9th Cir. 1985); *In re N.S. Garrott & Sons*, 772 F.2d 462 (8th Cir. 1985); *Georgia Pacific Corp. v. Sigma Serv. Corp.*, 712 F.2d 962 (5th Cir. 1983); *In re Signal Hill-Liberia Ave. Ltd. Ptsp.*, 189 B.R. 648 (Bankr. E.D. Va. 1995).

**12**

Agreement and the Plan. However, the terms of the Plan and Master Trust Agreement are themselves limited by applicable federal law.

In 1975, the Congress passed the Employee Retirement Income Security Program ("ERISA"). As part of ERISA, Congress specifically prohibited employers from ever using assets in a deferred compensation plan for anything but the exclusive benefit of plan participants:

> "[T]he assets of a plan shall <u>never inure to the benefit of any employer</u> and <u>shall be held for the **exclusive** purposes of providing benefits to participants in the plan and their beneficiaries</u> . . . "

29 U.S.C. § 1103(c)(1).

The Third Circuit has affirmed a federal district court decision strictly enforcing the statutory scheme of Title 29. In *Crown Cork and Seal Company, Inc. v. Teamsters Pension Fund*, 549 F. Supp. 307 (Dist. Pa. 1982), *aff'd* 720 F.2d 661 (1983), the District Court noted that ERISA was enacted to provide for comprehensive regulation of employee pension plans; and that Congress' overriding concern was that employees with long years of employment and contributions are assured of receiving their pension benefits (*Id.* at 308-309, citing § 1103(c)(1) and *Reuther v. Trustees of the Trucking Employees of Passaic and Bergen County Welfare Fund*, 575 F.2d 1074, 1077 (3d Cir. 1978). The District Court held that an employer does *not* possess a statutory right to bring a cause of action under 29 U.S.C. § 1132(e) to recover <u>mistaken</u> contributions to a pension fund because "employers" are not a class of individuals empowered to bring a civil action under ERISA. (*Id.* at 310-312) If an employer cannot recover mistaken contributions by right under § 1132(e), then surely actual contributions previously made by an employer cannot be returned to an employer under § 1103(c)(1).

Given the plain meaning of 29 U.S.C. § 1103(c)(1) and the holding of *Crown Cork*, it is highly unlikely that the District Court[2] would ever give effect or hold valid the provisions of the Plan cited above in paragraph 14, purporting to make the assets of the Trust subject to the claims of the Debtor's general unsecured creditors.

**4. Transferring A Deferred-Compensation Cash Account At Closing to Shaw Group Or To The Successful Overbidder May Irrevocably Prejudice Ms. Bookspan's Right to Trace Funds Because of Equitable Mootness Concerns.**

Ms. Bookspan is concerned that cash accounts relating to the Plan are not transferred to the Shaw Group or a successful overbidder. As the Court knows, debtors and buyers may take unilateral actions post-closing that may make otherwise valid legal claims equitably moot. *See, e.g., In re Highway Truck Drivers & Helpers Local Union 107,* 888 F.2d 293, 297 (3d Cir. 1989) (holding in case where § 363(m) protections were sought: "generally, an appeal will be dismissed as moot when events occur during the pendency of the appeal which prevent the appellate court from granting any effective relief.") Accordingly, Ms. Bookspan requests that the following language be inserted in any order approving the sale, to either the Shaw Group or the Successful Overbidder:

> **a. Proposed Language to Insert in Order Approving Sale:**
>
> The Debtors shall be, and hereby are, prohibited from transferring to the Shaw Group [or the successful overbidder], each and every cash account, escrow account, payroll account or functionally equivalent account that may be related to obligations arising under the Deferred Compensation Plan Effective January 1, 1996 (the

---

[2] The District Court has exclusive jurisdiction over causes of action arising under ERISA. 29 U.S.C. § 1132(e)(1).

**14**

"Plan"); and from transferring each and every cash account, escrow
account, payroll account or functionally equivalent account with
respect to which the Debtors' made accounting/book entries
restricting the use of cash or cash equivalent in such account due to
obligations arising under the Plan from the period November 1,
2001 to the Petition Date, absent further order of this Court in a
contested matter or adversary proceeding.

If the Debtor is correct that no such accounts exist or that no restrictions on an account were made, then such a provision will have no impact on the closing of the Debtors' sale to the Shaw Group or to a successful overbidder.

## **RELIEF REQUESTED**

**WHEREFORE**, for the foregoing reasons, Ms. Bookspan respectfully requests that the following language be inserted in any order approving the sale, to either the Shaw Group or the Successful Overbidder:

> The Debtors shall be, and hereby are, prohibited from transferring
> to the Shaw Group [or the successful overbidder], each and every
> cash account, escrow account, payroll account or functionally
> equivalent account that may be related to obligations arising under
> the Deferred Compensation Plan Effective January 1, 1996 (the
> "Plan"); and from transferring each and every cash account,
> escrow account, payroll account or functionally equivalent account
> with respect to which the Debtors' made accounting/book entries
> restricting the use of cash or cash equivalent in such account due to

**15**

obligations arising under the Plan from the period November 1, 2001 to the Petition Date, absent further order of this Court in a contested matter or adversary proceeding.

In the alternative, Ms. Bookspan requests that the Court deny the Sale Motion to the extent the Motion seeks to transfer any cash or accounts to the Shaw Group, or the Successful Overbidder.

Dated: April 11, 2002

LAW OFFICES OF THOMAS A. JOHNSON

/s/ Thomas A. Johnson

By: _____
Thomas A. Johnson (Cal. Bar No. 158270)[3]
33 West Mission Street, Suite 201
Santa Barbara, California 93101
Telephone: (805) 682-2600
Facsimile: (805) 682-2333

Attorney for Shelley Bookspan

---

[3] A motion to appear *pro hac vice* pursuant to Local Rule 9010-1(c) will be filed with the Court before the Sale Hearing.