IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - -x
                             :
In re:                       :  Chapter 11
                             :
The IT Group, Inc.,          :  Case No. 02-10118 (MFW)
     et al.,                 :
                             :  Jointly Administered
          Debtors.          :
                             :  Hrg. Date: 04/19/02, 11:30 a.m.
- - - - - - - - - - - - - - -x  Related to Docket No. 495
```

## DEBTORS' OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDERS PURSUANT TO SECTIONS 1104 AND 105 OF THE BANKRUPTCY CODE (I) DIRECTING THE APPOINTMENT OF AN EXAMINER WITH EXPANDED POWERS ON AN EMERGENCY BASIS, AND (II) DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

The IT Group, Inc. and certain of its subsid-
iaries, debtors and debtors-in-possession in the above-
captioned bankruptcy cases (the "Debtors"), hereby object
to the motion of the Official Committee of Unsecured
Creditors (the "Committee") for orders pursuant to sec-
tions 1104 and 105 of the Bankruptcy Code (I) directing
the appointment of an examiner with expanded powers on an
emergency basis and (II) directing the appointment of a
chapter 11 trustee (the "Motion") and in support, state
as follows:

## PRELIMINARY STATEMENT

1. For the reasons set forth more fully below, the Motion should not be granted because (i) the appointment of a chapter 11 trustee is moot in light of the appointment of the Examiner (as defined below); (ii) no cause exists to appoint a chapter 11 trustee; and (iii) the appointment of a chapter 11 trustee is not in the best interests of the Debtors' estates and creditors.

## ARGUMENT

## I. The Appointment Of A Chapter 11 Trustee Is Moot In Light Of The Appointment Of The Examiner.

2. As this Court is aware, the portion of the Motion seeking the appointment of an examiner was granted by the Court at the March 7, 2002 hearing. The Debtors and the Committee negotiated the Order Appointing Chapter 11 Examiner with Expanded Powers Pursuant to Sections 1104(c) and 1106 of the Bankruptcy Code (the "Examiner Order") which was entered by the Court on March 11, 2002 (Docket No. 539). Thereafter, the Office of the United States Trustee appointed R. Todd Neilson as examiner (the "Examiner") in these cases, which appointment was approved by order of the Court dated March 19, 2002 (Docket No. 627).

3. The Examiner Order gives the Examiner powers greater than those set forth in section 1106(b) of the Bankruptcy Code. Specifically, the duties of the Examiner include the following: (i) developing one or more detailed plans for the ongoing operations of the Debtors' business and (ii) exploring the prospects for a stand-alone plan of reorganization for the Debtors in comparison to the transaction set forth in the Debtors' motion for an order, inter alia, approving an asset purchase agreement dated as of January 23, 2002 (the "Shaw APA") between the Debtors and The Shaw Group Inc. ("Shaw") for the sale of substantially all of the Debtors' assets (the "Sale Motion"). Having an Examiner in these cases is sufficient to address the main concern of the Committee -- the exploration and viability of a stand-alone plan of reorganization -- which is one of the duties of the Examiner. The Examiner's powers can be modified by the Court sua sponte or on motion, after notice and a hearing, of any party in interest. Thus, should the Court find that the Examiner's role be expanded in these cases, sufficient means exist to expand his role.

4. In light of the appointment of the Examiner with expanded powers, the appointment of a chapter 11 trustee is moot and as described below, not justified.

**II. No Cause Exists To Appoint A Chapter 11 Trustee.**

5. The Committee argues that causes exists to appoint a chapter 11 trustee in these causes because "the record is replete with evidence of the Debtors' failure to assume its fiduciary duties under section 1107 of the Bankruptcy Code." Motion at ¶ 59. As set forth more fully below, the reasons given by the Committee to support the appointment of a chapter 11 trustee are not supported by the record in these cases or the First Report of R. Todd Neilson, as Examiner, for The IT Group, Inc., et al., Pursuant to Order of Appointment Dated March 11, 2002 (the "Examiner's Report") (Docket No. 980).

6. The Committee contends that the Debtors current CEO, Dr. Francis Harvey, is unqualified to manage the Debtors' operations. This allegation is simply untrue. Dr. Harvey is highly qualified and has worked closely with the Debtors' management team and professionals to lead the Debtors through this chapter 11 process by, among other things, (i) maintaining employee morale

to reduce the turnover of employees and (ii) creating and implementing cost saving measures.

7. In addition, the Committee argues that the Debtors have failed to implement any meaningful cost-cutting measures to maximize the value of the estate for creditors. <u>See</u> Motion at ¶ 63. The Debtors, however, have implemented meaningful post-petition cost-cutting measures by, <u>inter alia</u>, filing motions to reject various projects, including all related subcontracts (Docket Nos. 709, 763) and filing motions to reject various leases of personal property and unexpired leases of nonresidential real property (Docket Nos. 288, 710, 762). As recognized by the Examiner, the Debtors recently reduced personnel costs by terminating approximately 464 employees. <u>See</u> Examiner's Report at 49, ¶ c.

8. The Committee argues that the ability of Lehman Brothers ("Lehman") to assist the Debtors in selling their assets somehow is undermined by Lehman's alleged conflicts. Motion at ¶¶ 5, 59-60. The Debtors' application to retain Lehman Brothers ("Lehman") as financial advisors to the Debtors (Docket No. 315) was approved by the Court despite the Committee's objection to Lehman's retention based, in part, upon Lehman's alleged conflicts of interest. In addition, the Examiner

indicates that "the marketing of Assets by Lehman and others was reasonable, especially given the difficult circumstances surrounding, and the time constraints affecting, such efforts." Examiner's Report at 53. Therefore, the Committee's allegation that Lehman should not be retained and has not adequately fulfilled its role as financial advisors to the Debtors is not supported by the record or the Examiner's Report.

9.  The Committee argues that the Debtors have not taken steps to pursue alternatives, other than the consummation of the proposed sale to Shaw. As recognized by the Examiner, UBS Warburg, LLC, who was retained by the Debtors as a financial advisor, "conducted an exten-sive effort to obtain debtor-in-possession financing for the Debtors." Examiner's Report at 43. Thus, contrary to the Committee' assertions, the Debtors have pursued alternatives to the Shaw sale.

10.  The Committee contends that the provi-sions of the Shaw APA that require the Debtors to obtain the consent of Shaw before making material business decisions, are indicative of the Debtors' failure to fulfill fiduciary obligations to creditors. Motion at ¶¶ 61, 64. Section 5.03 of the Shaw APA provides that from the Effective Date until the Closing Date, the Sellers

6

must obtain the consent of Shaw (which shall not be unreasonably withheld or delayed) and if necessary the Court, before, <u>inter alia</u>, (i) amending or terminating any Assumed Contract; (ii) entering into a new Contract involving a commitment on the part of any Seller in excess of $250,000; and (iii) creating any new Encumbrance upon any of the Assets, except to provide adequate protection as is required by the Court.

11.     The provisions of the Shaw APA, which require the Debtors to consult with Shaw before making such business decisions, are routinely approved in this District.   <u>See</u>, <u>e.g</u>, <u>In re Worldwide Direct, Inc., et al.</u>, Case No. 99-108 (MFW) (Bankr. D. Del. March 18, 1999) (approving asset purchase agreement wherein Debtors agreed to obtain the written prior consent of the buyer before making business decisions such as amending or modifying any provision of Customer Agreements) (the relevant provisions of the asset purchase agreement are attached hereto as Exhibit A); <u>In re Stone & Webster, Inc., et al.</u>, Case No. 00-02142 (RRM) (Bankr. D. Del. July 13, 2000) (approving asset purchase agreement that provides for consent of buyers before sellers take certain actions, including amendment or termination of any Assumed Contract) (the relevant provisions of the asset

purchase agreement are attached hereto as Exhibit B); In
re Favorite Brands International Holding Corp. et al.,
Case No. 99-726 (PJW) (Bankr. D. Del. Nov. 18, 1999)
(approving asset purchase agreement wherein debtors
agreed to obtain purchaser's consent before entering into
a contract which requires aggregate payments of at least
$500,000) (the relevant provisions of the asset purchase
agreement are attached hereto as Exhibit C). The Debt-
ors' prepetition entry into the Shaw APA, with a provi-
sion requiring the Debtors to obtain Shaw's approval
prior to making certain business decisions, is not an
indication of the Debtors' mismanagement of their busi-
ness affairs but, instead, was an exercise of their
reasonable business judgment.

      12.    The Committee has not and cannot estab-
lish that cause exists to appoint a chapter 11 trustee in
these cases. The Committee has failed to meet its burden
of establishing the need for the appointment of a chapter
11 trustee in these cases by clear and convincing evi-
dence. In re PRS Ins. Group, Inc., 274, B.R. 381, 384
(Bankr. D. Del. 2001) (Walrath, J.).

**III. The Appointment Of A Chapter 11 Trustee Is Not In The Best Interest Of The Debtors' Estates And Creditors.**

13. The Committee asserts that since the Committee and the Debtors "disagree as to the benefits of the proposed transaction with Shaw and the Debtors' current management of the affairs of the estate", the appointment of a chapter 11 trustee is in the best interest of the creditors. Motion at ¶ 68. Although the Debtors and the Committee disagree about the benefits of the proposed sale to Shaw, the Examiner's Report indicates that the proposed sale to Shaw is in the best interests of the estates and creditors.

14. Specifically, the Examiner's Report states that "[t]he internal reorganization strategy proposed by the [Committee] in these Cases ... is not viable." Examiner's Report at 2. In addition, the Examiner notes that "any benefit in terms of enhanced value to the Estates generated by an internal reorganization would also flow largely to the Bank Group." Id. at 56. The Examiner further explains that "the unsecured and subordinated bondholders have virtually nothing to lose in attempting to effectuate a greater distribution through an internal reorganization." Id. 57-58.

9

15.    The appointment of a chapter 11 trustee
at this time would only delay the inevitable sale of
substantially all of the Debtors' assets to Shaw, or
another successful bidder(s), a course of action that the
Examiner indicates is in the best interest of the estates
and their creditors.  Examiner's Report at 4 ("The con-
sideration to be provided to the Debtors by the Shaw
Group under the proposed transaction approximates the
potential reorganization value of the Debtors.").  Thus,
the appointment of a chapter 11 trustee is not in the
best interests of the Debtors' estates and creditors.

**IV.   Reservation Of Rights.**

16.    The Debtors reserve their right to
supplement this objection and present any additional
arguments at a hearing to consider the Motion.

WHEREFORE, the Debtors respectfully request that the Court: (i) deny the Motion in its entirety and (ii) grant the Debtors such other and further relief as is just and proper.

Dated:   Wilmington, Delaware
         April 15, 2002

/s/ *Marion M. Quirk*
Gregg M. Galardi (I.D. No. 2991)
Marion M. Quirk (I.D. No. 4136)
Gary A. Rubin (I.D. No. 4041)
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

-and-

Timothy R. Pohl
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM (ILLINOIS)
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Attorneys for Debtors and
   Debtors-in-Possession

# Exhibit A

ASSET PURCHASE AGREEMENT

by and among

SMARTALK TELESERVICES, INC.,

certain SUBSIDIARIES of SmarTalk TeleServices, Inc.

and

AT&T CORP.

Dated as of

January 19, 1999

any of its Affiliates, or (b) violate or conflict with any statute, rule or regulation applicable to Buyer, any of its Affiliates or any of their properties or assets or any other material restriction of any kind or character to which Buyer or any of its Affiliates is subject that would prohibit or make unlawful the Asset Purchase. This Agreement has been duly executed and delivered by Buyer, and, assuming the due execution hereof by Sellers, this Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 4.2. Licenses, Approvals, Other Authorizations, Consents, Reports, Etc. Schedule 4.2 contains a list of all registrations, filings, applications, Consents or qualifications required to be made, filed, given or obtained by Buyer or any of its Affiliates with, to or from any person in connection with the consummation of the Asset Purchase except for (a) the filing of a premerger notification and report form by Buyer under the HSR Act, (b) those that become applicable solely as a result of the specific regulatory status of any Seller or any of its Affiliates, or (c) where the failure to make, file, give or obtain any of them would not prohibit or make unlawful the consummation of the Asset Purchase.

Section 4.3. Brokers, Finders, Etc. No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from the Company in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

Section 4.4. Financing. Buyer has available sufficient financing to consummate the Asset Purchase in accordance with its terms and the terms of this Agreement.

## ARTICLE 5

### Covenants of Sellers and Buyer

Section 5.1. Conduct of Business. During the period from the date of this Agreement to and through the Closing, the Company shall, and shall cause its subsidiaries to, carry on the Business in the ordinary course of business in conformity with all Applicable Laws and, to the extent consistent therewith, use all reasonable efforts to preserve the Business intact, keep available the services of their current officers and employees, and preserve the good will of and relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Business. Without limiting the generality of the foregoing, during the period from the date of this Agreement to and through the Closing, except as disclosed on Schedule 5.1, the Company shall not, and shall not permit any of its subsidiaries to, without the prior written approval of Buyer:

(a) (i) declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock or property) in respect of, any of its capital stock, other than dividends and distributions by any direct or indirect wholly-owned subsidiary of the Company to its parent, (ii) adjust, split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (iii) purchase, redeem or otherwise acquire any shares of capital stock of the Company or any of its subsidiaries or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities (other than in connection with the exercise of

Company Options in accordance with the terms thereof as in effect on the date hereof, as contemplated by Section 6.6);

(b)     except with respect to the securities of the Company, issue, deliver, sell, dispose, pledge or encumber, or authorize or propose the issuance, delivery, sale, disposition, pledge or encumbrance of, any shares of its capital stock of any class or other securities or any securities convertible into or exercisable or exchangeable for, or any rights, warrants, calls, commitments or options to acquire, any such shares or securities, or enter into any agreement with respect to any of the foregoing and shall not amend any equity-related awards issued pursuant to any Employee Benefit Plan, other than the issuance of Company Shares upon the exercise of Company Options;

(c)     amend its articles of incorporation, bylaws or other comparable charter or organizational documents in any manner that is inconsistent with prompt consummation of the transactions contemplated hereby in accordance with the terms hereof or that could otherwise reasonably be expected to have a Material Adverse Effect;

(d)     amend, modify or waive any provision of any of the Joint Venture Documents or make any material change to the operations or financial arrangements relating to any of the Joint Ventures;

(e)     amend, modify or waive any provision of the Customer Agreements or Supply Agreements or make any material change to the operations, services, or policies relating to customers or suppliers, other than as would be fully reflected in an Estimated Purchase Price Adjustment;

(f)     other than as would not reduce the value of any Asset or result in any Liability that would be or increase any Assumed Liability, mortgage or otherwise encumber or subject to any Encumbrance or, except in the ordinary course of business consistent with past practice and pursuant to existing contracts or commitments, sell, lease, license, transfer or otherwise dispose of any material properties or assets;

(g)     (i) incur, assume, guarantee or become obligated with respect to any indebtedness other than (A) borrowings under the DIP Credit Agreement and (B) ordinary course payables incurred in the ordinary course of business; (ii) incur, assume, guarantee or become obligated with respect to any other material obligations other than in the ordinary course of business and consistent with past practice; (iii) make any loans, advances or capital contributions to, or investments in, any other Person, other than by the Company or any of its subsidiaries to or in the Company or any of its wholly-owned subsidiaries; or (iv) pay, discharge or satisfy any claims, Liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than in the case of this clause (iv), (A) in the ordinary course of business consistent with past practice, and (B) as does not, and, in the reasonable judgment of Buyer, could not be expected to, impair the value of any Asset (including, without limitation, any Assumed Contract) or result in or increase any Assumed Liability;

(h)     make or agree to make any capital expenditures or capital additions that exceed $25,000 per calendar month;

-36-

(i)    incur or capitalize any cost or expense related to marketing funds, co-op funds or similar retailer other than any such costs or expenses which actually contribute to an Impaired Customer Adjustment or for which an Adjustment Consent is given;

(j)    permit its inventory of Prepaid Calling Cards at any time to fall below an amount adequate to supply reasonably anticipated demand for the Prepaid Calling Cards for the 30 day period beginning at such time (assuming the Company were continuing its operations and no Closing would occur during any such 30-day period);

(k)    fail to comply in any material respect with the DIP Credit Agreement;

(l)    make or rescind any material tax election or take any material tax position (unless required by law) or file any Return or change its fiscal year or financial or tax accounting methods, policies or practices (except as required by changes in GAAP) or settle or compromise any material income tax liability, except, in the case of any such tax election, tax position, Return, tax accounting method, tax accounting policy or tax accounting practice or tax liability, as would not reasonably be expected to affect the Buyer;

(m)    make any loan, advance or capital contributions to or investment in any person other than in any subsidiary;

(n)    (i) other than (A) as would not reduce the value of any Asset or result in any Liability that would be or increase any Assumed Liability as of or subsequent to the Closing, or (B) as actually contributes to a Purchase Price Adjustment, modify, amend or terminate any material contract or agreement to which it is a party (including any lease), or (ii) release or waive any material rights or claims, or, subject to the fiduciary duties of the Board of Directors of the Company under the CGCL as determined by the Board of Directors in accordance with the advice of outside counsel to the Company, and upon prior written notice to Buyer, waive the benefits of, or agree to modify in any manner, any confidentiality, standstill or similar agreement to which the Company or any of its subsidiaries is a party;

(o)    (i) grant any increases in the compensation of any of its directors, officers or employees, except increases in the ordinary course of business consistent with past practice that are not material, (ii) pay or award or agree to pay or award any pension, retirement allowance, or other nonequity incentive awards, or other employee benefit, not required by any outstanding employee benefit plans or arrangements to any current or former director, officer or employees, whether past or present, or to any other Person, except for payments or awards that are in the ordinary course of business, consistent with past practice, and that are not material, (iii) enter into any new or amend any existing employment agreement with any director, officer or employee, except for employment agreements with new employees entered into in the ordinary course of business consistent with past practice and, with respect to employees who are not officers, executives or directors of the Company or its subsidiaries, except for amendments in the ordinary course of business, consistent with past practice, that do not materially increase benefits or payments, (iv) enter into any new or amend any existing severance agreement with any current or former director, officer or employee, except, with respect to employees who are not officers, executives or directors of the Company or its subsidiaries, for agreements or amendments in the ordinary course of business, consistent with past practice, that do not provide for materially

increased benefits, (v) other than the acceleration of outstanding Company Options pursuant to Section 6.6 and other than as could not be expected to impair the value of any Asset or result in any Liability that would be or increase any Assumed Liability, enter into any agreement or exercise any discretion providing for acceleration of payment or performance as a result of a change of control of the Company or its subsidiaries or (vi) become obligated under any new employee benefit plan or arrangement, which was not in existence on the date hereof or amend or exercise discretion pursuant to any such employee benefit plan or arrangement in existence on the date hereof, except for any such amendment applicable only to employees who are not officers, executives or directors of the Company or its subsidiaries or exercise of discretion in the ordinary course of business, consistent with past practice (that does not disproportionately effect officers, executives or directors as opposed to other employees);

(p)   adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of its subsidiaries that is inconsistent with prompt consummation of the transactions contemplated hereby in accordance with the terms hereof or could otherwise reasonably be expected to have a Material Adverse Effect;

(q)   make any acquisition, by means of merger, consolidation or otherwise, of (i) any direct or indirect ownership interest in or assets comprising any business enterprise or operation or (ii) except in the ordinary course and consistent with past practice, any other assets;

(r)   enter into any agreement containing any provision or covenant limiting the ability of the Company or any of its subsidiaries to (i) sell any products or services of or to any other person, (ii) engage in any line of business or (iii) compete with or to obtain products or services from any person or limiting the ability of any person to provide products or services to the Company or any of its subsidiaries;

(s)   (i) take or agree or commit to take any action that would make any representation or warranty of the Company hereunder inaccurate in any material respect at, or as of any time prior to, Closing or (ii) omit or agree or commit to omit to take any action necessary to prevent any such representation or warranty from being inaccurate in any material respect at any such time;

(t)   fail to pay any premiums when due with respect to any of the insurance policies set forth in Schedule 2.1(p);

(u)   fail to maintain any Leased Real Estate in its current condition, ordinary wear and tear excepted; or

(v)   authorize any of, or commit or agree to take any of, the foregoing actions.

Section 5.2.   Access to Information.   (a) From the date hereof to and through the Closing, Sellers shall give Buyer, its counsel, financial advisors, auditors and other authorized representatives full access (during normal business hours and upon reasonable notice) to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of the Company and its subsidiaries, will furnish to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial,

# Exhibit B

ASSET PURCHASE AGREEMENT

BY AND AMONG

STONE & WEBSTER, INCORPORATED,

CERTAIN SUBSIDIARIES

OF

STONE & WEBSTER, INCORPORATED

AND

THE SHAW GROUP INC.

DATED AS OF JULY __, 2000

5.03. <u>Certain Actions</u>. From the Effective Date until the Closing Date, except as otherwise expressly provided in this Agreement or as set forth on <u>Schedule 5.03</u>, Sellers shall not take any of the following actions without first obtaining the consent of Buyer:

(a) amend or terminate any Assumed Contract other than an Immaterial Contract, or enter into any Contract involving a commitment on the part of any Seller in excess of One Hundred Thousand Dollars ($100,000), except for the DIP Financing;

(b) make offers to any employees of the Business for employment with any Person after Closing or make any material change in personnel, operations, finances, accounting policies, or real or personal property of the Business;

(c) increase compensation payable or to become payable to, make a bonus or severance payment to, or otherwise enter into one or more bonus or severance agreements with, any employee or agent of any Seller except pursuant to the Retention Plan;

(d) create, assume or permit to exist any new Encumbrance upon any of the Assets, except for Encumbrances securing the DIP Financing or providing adequate protection as is required by the Bankruptcy Court;

(e) sell, assign, transfer, distribute or otherwise dispose of any property, plant or equipment of any Seller having an original cost in excess of Fifty Thousand Dollars ($50,000);

(f) take any action outside the ordinary course of the Business;

(g) amend or agree to amend the articles or certificate of incorporation or other organizational documents or the bylaws or other governing documents of any Seller or otherwise take any action relating to any liquidation or dissolution of any Seller;

(h) create, incur, assume, guarantee or otherwise become liable for any liability of any Seller, or agree to do any of the foregoing, except for liabilities and obligations constituting DIP Financing;

(i) cancel, forgive, release, discharge or waive any receivable or any similar Asset or right with respect to the Business, or agree to do any of the foregoing;

(j) change any accounting method, policy or practice in the Financial Statements; or

(k) terminate, amend or otherwise modify any Employee Benefit Plan or Other Plan, except for amendments required to comply with applicable Legal Requirements or as requested by Buyer.

5.04. <u>Employee Matters</u>.

(a) Subject to the exclusions set forth in this <u>Section 5.04</u>, Buyer may communicate (after consulting with management of S&W) with any employees of any Seller and may offer, or cause its Affiliates to offer, to employ as of the Closing Date all active employees of Sellers working at the Business on the Closing Date to whom Buyer, in its sole discretion, may choose

10.03. <u>Reproduction of Documents</u>. This Agreement and all documents relating hereto, including consents, waivers and modifications which may hereafter be executed, the documents delivered at the Closing, and financial statements, certificates and other information previously or hereafter furnished to any party may be reproduced by any party by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and the parties may destroy any original documents so reproduced. The parties stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the ordinary course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

10.04. <u>Time of Essence</u>. Time is of the essence in the performance of this Agreement. This Section may be waived only in a writing expressly referring hereto.

10.05. <u>Consents, Approvals and Discretion</u>. Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party that is not in such party's sole discretion or any party must or may exercise discretion (other than its sole discretion), such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

10.06. <u>Choice of Law; Submission to Jurisdiction</u>. Except as otherwise provided in this Section 10.06, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to such state's conflicts of laws rules. Each of the Parties hereby (a) submits to the exclusive jurisdiction of the Delaware chancery court for purposes of all legal proceedings arising out of or relating to this Agreement or the Transaction and irrevocably waives, to the fullest extent permitted by law, any objection to the laying of venue of any such proceeding brought in such court and any claim that such court is an inconvenient forum or (b) with respect to the Bankruptcy Cases and issues relating thereto that are properly within the jurisdiction of the Bankruptcy Court, submits to the exclusive jurisdiction of the Bankruptcy Court for such purposes and irrevocably waives, to the fullest extent permitted by law, any objection to the laying of venue of any such proceeding brought in such Bankruptcy Court and any claim that such Bankruptcy Court is an inconvenient forum; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court abstains or otherwise determines not to hear such proceeding, then the provisions of <u>clause (a)</u> above shall apply.

10.07. <u>Benefit; Assignment</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns. No party may assign this Agreement without the prior written consent of the other parties; <u>provided</u>, <u>however</u>, that Buyer may assign this Agreement, in whole or in part, to any Affiliate of Buyer.

10.08. <u>No Third Party Beneficiary</u>. The terms and provisions of this Agreement (including provisions regarding employee and employee benefit matters) are intended solely for the benefit of the parties, Buyer's Indemnified Persons, Sellers' Indemnified Persons, and their respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights upon any other Person. Any reference in this Agreement to one or more Employee Benefit Plans of Buyer or S&W includes provisions, if any, in such plans permitting their termination or amendment and any covenant in this Agreement to provide benefits under

Exhibit C

ASSET PURCHASE AGREEMENT

by and among

FAVORITE BRANDS INTERNATIONAL HOLDING CORP.
FAVORITE BRANDS INTERNATIONAL, INC.
SATHER TRUCKING CORPORATION and
TROLLI, INC.,

as Sellers

and

NABISCO, INC.,
NABISCO BRANDS COMPANY and
NABISCO TECHNOLOGY COMPANY,

as Purchasers

Dated as of September 28, 1999

as may, upon the advice of counsel, be required by law or any listing agreement with any national securities exchange.

SECTION 5.09. *Conduct of the Business.* Except as otherwise provided herein or authorized by the Bankruptcy Court prior to the date hereof, from the date hereof until the Closing Date, the Sellers:

      (a)   shall conduct the Business in the ordinary course and shall use commercially reasonable efforts to preserve intact the business organizations and relationships with third parties and to keep available the services of the present employees of the Business;

      (b)   shall not take or agree to commit to take any action that they know would make any representation or warranty of Sellers hereunder inaccurate in any material respect at, or as of any time prior to, the Closing Date;

      (c)   shall not offer credit terms or trade promotions to any Major Customers except in the ordinary course consistent with past practices with respect to the applicable product lines of Sellers (Trolli, General Line Candy, Fruit Snacks and Marshmallow) or except to the extent reasonably necessary to be competitive with competitors' product offerings; and

      (d)   shall not, without Purchasers' Consent, enter into any contract (other than a purchase order or sale order entered into in the ordinary course) which requires aggregate payments of at least $500,000. **"Purchasers' Consent"** means the Purchasers's consent (which shall not unreasonably be withheld) to the matters described in clause (d) of this Section. Purchasers shall be deemed to have given such consent if they shall not have notified either of Brooks Gruemmer by e-mail (Gruemmer_b@favbrands.com) or facsimile (847-444-2123) or Steve Kaplan by e-mail (Kaplan_s@favbrands.com) or facsimile (847-444-2114) of their disapproval of such contract or arrangement not later than the end of the next business day after delivery of an e-mail communication to each of Rick Pace (Pacer@Nabisco.com) and Tom Whitten (Whittent@Nabisco.com) which sets forth the material terms and conditions of such contract or arrangement. If Purchasers disapprove of any such arrangement or contract pursuant to this clause (d), then any event, condition or matter that arises in connection with, or as a result of, such disapproval shall not in any manner (i) be deemed to be a breach of any of Sellers' representations, warranties, covenants or obligations under this Agreement, or (ii) constitute a Material Adverse Effect.

CERTIFICATE OF SERVICE

I, Marion M. Quirk, hereby certify that on this 15th day of April 2002, I caused the foregoing **Debtors' Objection to Motion of the Official Committee Of Unsecured Creditors for Orders Pursuant to Sections 1104 and 105 of the Bankruptcy Code (I) Directing The Appointment of an Examiner with Expanded Powers On an Emergency Basis, and (II) Directing the Appointment of a Chapter 11 Trustee** to be served on the parties listed on Exhibit A, attached hereto, in the manner indicated thereon.

_____
Marion M. Quirk

**Debtors**
The IT Group, Inc.
2790 Mosside Blvd.
Monroeville, PA 15146-2792
**(By Overnight Courier)**

**United States Trustee**
Mark S. Kenney, Esq.
Assistant U.S. Trustee
Office of the U.S. Trustee
844 King Street
Wilmington, DE 19899
**(By Facsimile and By Hand Delivery)**

**Counsel to Creditors' Committee**

Jeffrey M. Schlerf, Esq.
The Bayard Firm
222 Delaware Avenue
Suite 900, P.O. Box 25130
Wilmington, Delaware 19899
**(By Facsimile and By Hand Delivery)**

Thomas E. Lauria, Esq.
White and Case, LLP
First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2352
**(By Facsimile and By Overnight Courier)**

**Counsel for Prepetition Bank Group**

Stephen Karotkin, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
**(By Facsimile and By Overnight Courier)**

Richard S. Cobb, Esq.
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street
Suite 1410
Wilmington, DE 19801
**(By Facsimile and By Hand Delivery)**

**Counsel for Postpetition Bank Group**

Michael A. Rosenthal, Esq.
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue
Suite 1100
Dallas, Texas 75201
(The Shaw Group, Inc.)
**(By Facsimile and By Overnight Courier)**

William P. Bowden, Esq.
Christopher S. Sontchi, Esq.
Ashby & Geddes
222 Delaware Avenue, 17th Floor,
P.O. Box 1150
Wilmington, DE 19899
(The Shaw Group, Inc.)
**(By Facsimile and By Hand Delivery)**

**Examiner**
Todd Neilson
Neilson Elggren LLP
10100 Santa Monica Blvd.
Suite 410
Los Angeles, CA 90067
**(By Facsimile and By Overnight Courier)**

Richard M. Pachulski
Ira D. Kharasch
Pachulski, Stang, Ziehl, Young & Jones P.C.
10100 Santa Monica Blvd.
Suite 1100
Los Angeles, CA 90067
(Counsel to the Examiner)
**(By Facsimile and By Overnight Courier)**

Laura Davis Jones
Pachulski, Stang, Ziehl, Young &
Jones P.C.
919 North Market St., 16th Floor
P.O. Box 8705
Wilmington, DE   19899-8705
(Counsel to the Examiner)
**(By Facsimile and By Hand
Delivery)**