IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| THE IT GROUP, INC., *et al.*, | § | Case No. 02-10118 (MFW) |
| | § | |
| Debtors. | § | Jointly Administered |

**SUPPLEMENTAL RESPONSE OF THE SHAW GROUP INC. TO MOTION AND
SUPPLEMENTAL REPLY OF NORTHROP GRUMMAN TECHNICAL
SERVICES, INC. AND WACKENHUT SERVICES, INC. FOR AN ORDER GRANTING
RELIEF FROM THE AUTOMATIC STAY (Re: Docket Nos. 277, 454 and 632)**

The Shaw Group Inc. ("Shaw") hereby files its supplemental response to the motion (the

"Motion") of Northrop Grumman Technical Services, Inc. ("Northrop") and Wackenhut

Services, Inc. ("Wackenhut", and, together with Northrop, the "Movants") for an order granting

relief from the automatic stay to allow the Movants to exercise their buyout rights under a limited

liability company operating agreement (the "Membership Agreement") to which IT

Environmental and Facilities, Inc. ("ITEF") is a party, and its response to the Movants'

supplemental reply in support of the Motion (the "Reply"). In support thereof, Shaw respectfully

submits:

## I. BACKGROUND

1.  On June 30, 1998, the Movants and ITEF formed Space Gateway Support, a

Virginia general partnership (the "Partnership"), for the purpose of soliciting and performing

federal contract number NAS10-990001 (the "Contract"). The Contract is slated to run through

September 30, 2003, with the possibility of an extension through 2008. The Contract involves

management of certain aspects of NASA's operations at Cape Canaveral, Florida.

2.  The Movants and ITEF were subsequently awarded the Contract, and entered into

the Membership Agreement for the purpose of merging the Partnership into Space Gateway

Support, LLC, a subsequently formed limited liability company formed under the laws of Delaware (the "LLC"). At all times since, the LLC has performed the Contract, and the Contract has been the principal asset of the LLC. Northrop holds a 54% interest in the LLC, while ITEF and Wackenhut each hold 23% interests in the LLC.

3. On January 16, 2002 (the "Petition Date"), The IT Group, Inc. and numerous affiliates thereof (including ITEF) (together, the "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code").

4. In the weeks leading up to the Petition Date, Shaw began negotiating with the Debtors to purchase substantially all of the Debtors' assets, including the Debtors' interest in the LLC. The parties subsequently entered into an asset purchase agreement (the "Asset Purchase Agreement") to accomplish that end.

5. The Movants filed the Motion and Reply in support of their contentions that: (i) ITEF's membership rights in the LLC were terminated as a result of ITEF's chapter 11 cases; (ii) ITEF should not be permitted to assign its interest in the LLC to Shaw or any other party; and (iii) cause existed for the Court to grant relief from the automatic stay to allow the Movants to force a sale of the Debtors' interest in the LLC for approximately $3.9 million, a price purportedly tied to the value of ITEF's capital account with respect to the LLC.

6. On or about March 13, 2002, the United States Trustee appointed an examiner (the "Examiner") in the Debtors' chapter 11 cases. Pursuant to the Court's order authorizing the Examiner's appointment, the Examiner undertook to assess the economics of the Debtors' rights and interests under the LLC, the Membership Agreement and the Contract (together, the "Space Gateway Assets"). In a supplemental report disseminated on or about April 18, 2002 (the

"Supplemental Report"), the Examiner reported to the Court that ITEF's interest in the Space Gateway Assets had an estimated value ranging between $2.8 million and $8.3 million,[1] *plus* the present value of ITEF's capital account, the value of which the Examiner was unable to determine.

7.      On April 25, 2002, the Court approved the terms of the Asset Purchase Agreement and the Debtors' sale of substantially all of their assets to Shaw.  As a result of the arguments raised by the Movants in the Motion and the Reply, the Space Gateway Assets were temporarily carved out of the assets to be transferred pursuant to the Asset Purchase Agreement.

8.      On May 3, 2002, the Debtors and Shaw consummated the sale of substantially all of the Debtors' assets to Shaw.

## II.      CONFLUENCE OF THE SPACE GATEWAY ASSETS

9.      As set forth in the Preamble to the Membership Agreement, the Movants and ITEF determined it to be in their mutual best interests to use a limited liability company to perform the Contract, rather than the general partnership form they were then using.  In accordance with that determination, the Movants and ITEF formed the LLC and immediately merged the Partnership therewith.  At all times since this merger, the LLC has performed the Contract.

## III.      SHAW IS AN INTERESTED PARTY UNDER SECTION 1109 OF THE BANKRUPTCY CODE

10.      In the Reply, the Movants contend Shaw has no standing to be heard in this matter.  Section 1109(b) of the Bankruptcy Code identifies those parties who may appear and be

---

[1]      *See* Supplemental Report, at 24 (noting the value of ITEF's interest in the Space Gateway Assets is dependent on a number of factors, including whether NASA extends the Contract beyond September 30, 2003.

heard in a chapter 11 case. In sum, this section provides that "a party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or an indenture trustee, may raise and may appear and be heard on any issue in a case under [chapter 11]."[2]

11.     Although the Bankruptcy Code does not define "a party in interest", the Third Circuit has found this term to include any person who has sufficient stake in the proceeding so as to require representation.[3] The determination of whether a party has a "sufficient stake" is to be made on a case by case basis.[4] Here, in exchange for substantially all of the Debtors' assets (including the Debtors' interest in the LLC), Shaw offered and has paid to the Debtors consideration having an estimated value of $262 million.[5] Of this consideration, approximately $6.15 million in cash and $2.85 in Shaw common stock were allocated to the Space Gateway Assets. Through the Motion and the Reply, the Movants are attempting to force a sale of the Space Gateway Assets for approximately $3.9 million, a sum approximately $5.1 million less than what Shaw paid the Debtors for these same assets. For the Movants to now argue that Shaw does not have a sufficient stake in this matter to warrant representation is simply untenable.

12.     In support of their contention that Shaw does not have standing to be heard on this matter, the Movants cite *In re Karpe*[6] for the proposition that an "interested purchaser is not a

---

[2]     11 U.S.C. § 1109(b).

[3]     *In re* Amatex, 755 F.2d 1034, 1042 (3d Cir. 1985); *In re* Grand Union Co., 179 B.R. 56, 58 (D. Del. 1995).

[4]     *See* Id.

[5]     *See* First Report of R. Todd Neilson, as Examiner for The IT Group, Inc., et al., Pursuant to Order of Appointment Dated March 11, 2002, at 53.

[6]     84 B.R. 926 (Bankr. M.D. Pa. 1988).

party in interest."[7] In *In re Karpe*, the Debtor entered into an agreement to sell real property to Oliver, a potential purchaser.[8] After the passage of a series of court–established deadlines for parties to object to the aforementioned sale, an outside party submitted a competing bid for the real estate.[9] After considering the meaning of the term "party in interest", the court found that the late-coming party did not have standing under section 1109(b) of the Bankruptcy Code to interfere with the debtor's sale of the real property to Oliver.[10] The *Karpe* court's decision rested on its determination that the outside party had no interest in the *res* being created in that chapter 11 proceeding, a *res* that would be created due to the execution of the sale agreement between the debtor and Oliver.[11] Since Shaw's position in the instant controversy is more analogous to that of Oliver in the *Karpe* case, the Movants' reliance on that case is highly questionable.

13.     Next, the Movants cite *In re Access Beyond Technologies*,[12] for the proposition that, since the purchaser in that case did not appear in the reported decision, Shaw is necessarily prohibited from appearing to protect its interests in this case.[13] Perhaps the Movants cite *Access Beyond Technologies* because, in that case, this Court, on facts wholly distinguishable from those before the Court today, prohibited the transfer of a license agreement. As this Court's decision in

---

[7]     *See* Reply, at 12.

[8]     84 B.R. at 927.

[9]     Id. at 928.

[10]    Id. at 929.

[11]    Id.

[12]    237 B.R. 32, 37 (Bankr. D. Del. 1999).

[13]    *See* Reply, at 12.

*In re Access Beyond Technologies* has no discussion of section 1109(b) or standing, Shaw contends that the Movants' citation thereto is misleading and inappropriate.

14.     In accordance with applicable Third Circuit law, Shaw believes it has a sufficient stake in the matter such that its interests warrant representation and, accordingly, Shaw is a party in interest to this proceeding for purposes of section 1109(b). The Movants have cited no cases requiring, or even supporting, a contrary result.

## IV.     THE MEMBERSHIP AGREEMENT IS NOT AN EXECUTORY CONTRACT

15.     In the Motion and the Reply, the Movants rely on the assertion that the Membership Agreement is an executory contract for purposes of section 365 of the Bankruptcy Code, seemingly because the Membership Agreement contains provisions dealing with capital contributions and management of the LLC.[14] Once this tenuously placed lynchpin is removed, the remainder of the Movants' arguments come tumbling down and Movants bottom-line motivation is revealed:  to deprive ITEF and Shaw of the monetary and non-monetary[15] benefits under the Membership Agreements, for inadequate compensation. Hence, Movants have offered $3.9 million for an interest in the LLC that ITEF and Shaw value in excess of $8 million.

16.     For section 365 to apply, there must first be an "executory contract" at issue. While the Bankruptcy Code does not provide a definition for executory contracts, Third Circuit courts have relied on what has become known as the Countryman definition.[16] Professor

---

[14]     Motion, at 8-9. Reply, at 2-4.

[15]     The LLC is a party to the Contract, which relates to the operation of Cape Canaveral. Accordingly, the Contract represents a high profile opportunity which has significant non-monetary, as well as monetary, benefits to the LLC and its members.

[16]     *See In* re Beck, 2002 U.S. App. LEXIS 1761, *5 - *6 (3d Cir. 2002); In *re* Columbia Gas Systems, Inc., 50 F.3d 233, 244 n.20 (3d Cir. 1995). *See generally* Countryman, Executory Contracts in Bankruptcy; Part I, 57 Minn. L. Rev. 439 (1973).

Countryman defined an executory contract as one under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a ***material breach*** excusing the other from performing.[17] Unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory for purposes of section 365 of the Bankruptcy Code.[18]

17.     Application of the Countryman definition of executory contracts necessarily requires a determination of whether the contract in question is so far unperformed that the failure of any party to fulfill its obligations would constitute a material breach. Materiality goes to the very essence of the contract in question.[19] A particular breach is material only if it will deprive the injured party of the benefit that is justifiably expected.[20] The doctrine of material breach is simply the converse of the doctrine of substantial performance.[21] Substantial performance is performance without material breach, and a material breach arises from a failure to substantially perform.[22]

18.     Implicit in the Third Circuit's adoption of the Countryman definition is the recognition that not every breach of a contract is material. Further, because a contract may be so far performed that only non-material obligations remain, not every contract under which

---

[17]     *See* Countryman, at 460. *Accord In re* Beck, 2002 U.S. App. LEXIS at \*6; Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989).

[18]     *In re* Beck, 2002 U.S. App. LEXIS at \*6; *In re* Columbia Gas Sys. Inc., 50 F.3d 233, 239 (3d Cir. 1995).

[19]     General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 315 (3d Cir. 2001).

[20]     Id. (quoting 2 E. Allen Farnsworth, Farnsworth on Contracts § 8.16, at 497 (2d ed. 1998).

[21]     Id. at 317, fn. 8.

[22]     Id.

obligations remain is an executory contract. Rather, it is only where all parties to the contract have yet to substantially perform (and thus be in a position to commit a material breach by failing to perform) that a contract can be deemed executory.

19.     The Restatement (Second) of Contracts provides some guidance as to whether a particular breach is a material breach. More specifically, Restatement (Second) of Contracts §241 provides:

<u>Circumstances Significant in Determining Whether a Failure is Material</u>

In Determining whether a failure to render or offer performance is material, the following circumstances are significant:

(a)     the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b)     the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived;

(c)     the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d)     the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurance;

(e)     the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing.[23]

20.     Application of the foregoing to determine whether a material breach has occurred requires the Court to engage in an analysis of the impact of the failure of any party to perform its respective remaining duties under a particular contract. Evaluation of each of these factors underscores that the Contract is not executory for purposes of Section 365 of the Bankruptcy Code as no breach by ITEF could be so material as to excuse Movants from performing.

---

[23]     Restatement (Second) of Contracts § 241 (1981).

21.     Section 241(a) of the Restatement (Second) of Contracts calls for an examination of what the Third Circuit has called "the essence" of the contract in question.[24] In effect, the "essence" of a particular contract is the reason the parties entered into the agreement. As set forth in the Preamble to the Membership Agreement, the LLC was formed because the Movants and ITEF determined it to be in their mutual best interests to use a limited liability company to perform the Contract.[25] Importantly, the "essence" of the Membership Agreement was not extracting capital contributions or management services from the respective members. These matters were simply ancillary to the LLC's performance of the Contract.

22.     Without question, there is no action that could be taken by either the Movants or ITEF that would serve to unravel the successful solicitation of the award of the Contract. Further, implicit in the Movants' request to force ITEF out of the LLC is the recognition that the LLC will be capable of continuing to perform the Contract with no further contribution by ITEF. Shaw contends that these factors militate in favor of a finding that ITEF has substantially performed its obligations under the LLC, and that the failure of ITEF to perform any of its remaining duties would be an immaterial breach not disturbing the "essence" of the Membership Agreement.

23.     Section 241(b) of the Restatement (Second) of Contracts requires the Court to consider the extent to which the Movants "can be adequately compensated for the part of the benefit of which [they] will be deprived." Shaw contends the provisions of the Membership Agreement provide for adequate compensation to the Movants for any breach, hypothetical or real, that ITEF could commit.

---

[24]     General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 315 (3d Cir. 2001).

[25]     Membership Agreement, at Preamble.

24.     For instance, Movants claim that ITEF has failed to make a required capital contribution. While Shaw and ITEF dispute that an appropriate capital call was made prior to the filing of ITEF's chapter 11 case, Shaw has committed to promptly meet any such required capital call once it is made. Moreover, upon the failure of ITEF, or any other member of the LLC, to remit a requested capital contribution, the Membership Agreement provides a mechanism by which the non-defaulting members may obtain replacement financing, either through obtaining or issuing an interest bearing loan guaranteed by the defaulting member or through an offset against distributions subsequently due to the defaulting member.

25.     The Movants further contend that each of the members of the LLC also has "significant ongoing management responsibilities under the Membership Agreement."[26] To the contrary, ITEF is allowed to appoint one out of the four managers of the manager-managed LLC. These managers provide the day-to-day oversight of the affairs of the LLC, without further action or consent by the individual members. As a practical matter, the vast majority of the authority allocated to the managers is vested in an executive manager appointed by Northrop. Further, each member of the LLC is empowered to remove its respective manager(s), and is not required to replace such manager(s) within any specified period of time.[27] Moreover, other than as specifically set forth in the Membership Agreement or required by applicable law, neither the Movants nor ITEF shall themselves: (i) participate in the management or affairs of the LLC; (ii) be an agent of the LLC; (iii) execute any instrument on behalf of the LLC; or (iv) have the power

---

[26]     Reply, at 3.

[27]     Membership Agreement, at § 5.2 ("Any [member of the LLC] may remove its appointed manager at any time and for any reason.").

to bind the LLC.[28]  Shaw submits that, in light of the forgoing, the ongoing management obligations of ITEF, if any, are neither substantial nor material.  Rather, the provisions of the Membership Agreement dealing with the management of the LLC are more in the form of insubstantial rights to appoint a representative to monitor the affairs of the LLC instead of affirmative obligations to provide management expertise.

26.     By focusing on the degree of forfeiture by the defaulting party if a breach is deemed material, Section 241(c) of the Restatement (Second) of Contracts involves a determination of whether the defaulting party has already provided substantial performance, the converse of a material breach.  A failure is less likely to be material if it occurs later, after the defaulting party has provided substantial performance to the non-defaulting party.[29]  In this case, ITEF has already provided substantial performance under the Membership Agreement, and, deeming any default by ITEF to be a material breach would result in a great forfeiture by ITEF. More specifically, ITEF contributed its expertise and manpower to the solicitation and ultimate award of the Contract.  ITEF contributed substantial start-up resources to facilitate the initial award and performance of the Contract.  Finally, ITEF brought to bear the industry-wide respect accorded to it and its parent, The IT Group, Inc., in the effort to win the Contract.  Now, after approximately 75% of the Contract for which the LLC was formed has been fulfilled, and after the vast majority of the performance owed by the members has already been delivered, it would constitute a great hardship and forfeiture for ITEF if a failure to perform any of its minor remaining duties was deemed to be a material breach permitting the other members to discontinue their relationship with ITEF.

---

[28]     Membership Agreement, at § 4.5.

[29]     Restatement (Second) of Contracts § 241(c) cmt. d (1981).

11

27. Finally, application of factors enumerated in Sections 241(d) and (e) of the Restatement (Second) of Contracts also suggest that the breach, if any, by ITEF is not so significant as to rise to the level of a material breach. Section 241(d) requires an assessment of the likelihood of cure of any breach. Both ITEF and Shaw, as the acquiror of ITEF's interest in Space Gateway, have agreed promptly to cure any default alleged to have occurred, and Shaw has provided reasonable evidence of its ability and willingness to do so. Section 241(e), on the other hand, focuses on whether ITEF has acted in good faith relative to the Membership Agreement. Given the filing of ITEF's chapter 11 case and the imposition of a federal statute prohibiting the payment of pre-petition amounts due, ITEF's failure to satisfy any alleged pre-filing capital call can hardly be classified as not comporting with the standards of good faith and fair dealing.

28. Accordingly, Shaw asks that this Court recognize that ITEF has already substantially performed its obligations under the Membership Agreement, and, thus, that the failure to perform any of its remaining obligations would constitute an immaterial breach. Accordingly, the Membership Agreement is not an executory contract, and the provisions of Section 365 of the Bankruptcy Code are inapplicable.

### V. The Anti-Assignment, Ipso Facto, Buyout and Right of First Refusal Provisions of the Membership Agreement Are Not Enforceable

29. Even if the Membership Agreement is determined to be an executory contract, the anti-assignment, ipso-facto, buyout and right of first refusal provisions of the Membership Agreement should not be given effect by this Court. Rather, these provisions fly in the face of the rehabilitative purpose of the Bankruptcy Code.

30. In support of their attempt to force a sale of ITEF's interest in the LLC at depressed values, the Movants first magically deem the Membership Agreement to be executory,

and then rely on the "applicable law" language found in sections 365(c)(1)(A) and 365(e)(2)(A) to suggest that what otherwise would clearly be unenforceable anti-assignment, ipso-facto and related provisions must be given effect. In their attempt to extrapolate this "applicable law" concept to the current dispute, the Movants rely almost exclusively on a line of partnership cases where such provisions have been given effect in circumstances wholly different than those before the Court today. Importantly, the entity at issue here is not a partnership. Instead, it is a limited liability company, a creature of statute bearing many of the attributes of a corporation.

31. The Movants and ITEF willingly and knowingly took affirmative action to change the form of the vehicle to be used to perform the Contract. Had the parties intended to operate as a general, or even a limited, partnership, they would not have merged the Partnership into the LLC.

32. Given the relatively recent creation of limited liability companies, the full consequence of the intersection of these entities and the "applicable law" concept embodied in sections 365(c)(1)(A) and 365(e)(2)(A) is not readily apparent from the case law.[30] Moreover, because of the many differences between partnership law and LLC law, partnership cases addressing this issue, while somewhat instructive, are not determinative. In the most recent opportunity for this issue to be addressed in this district, U.S. Magistrate Judge Thynge decided the case on alternative grounds.[31]

33. As an initial matter, sections 365(c)(1)(A) and 365(e)(2)(A) do not explicitly apply to partnerships or limited liability companies. Rather, both sections rest on the

---

[30]    Although Wyoming passed the first limited liability company statute in 1977, Delaware did not add its own limited liability statute until 1992.

[31]    Chase Manhattan Bank v. Iridium Africa Corp., 2002 U.S. Dist. LEXIS 7799 (D. Del. 2002).

interpretation of references to "applicable law." Section 365(c)(1)(A) can be interpreted to excuse the non-debtor party to a contract from performing "if the identity of the debtor is a material condition of the contract when considered in the context of the obligations which remain to be performed under the contract."[32] To phrase it differently, only when the "applicable law" at issue prohibits assignment because the identity of the contracting party is material will section 365(c)(1) rescue the offending provision.[33]

34.     An examination of the LLC reveals that the obligations still owed by ITEF are not of a personal nature, and that the identity of the party standing in ITEF's shoes is irrelevant. Accordingly, the anti-assignment provision in the Membership Agreement is an unenforceable *ipso facto* clause which is not protected by section 365(c)(1)(A).

35.     In support of the Motion and Reply, the Movants have made repeated references to capital contributions owed by ITEF. As money is fungible, ITEF's remaining obligations to provide capital contributions could be performed by any assignee. To that end, Shaw stands ready to pay any and all past-due capital contributions owed by ITEF.

36.     Similarly, ITEF's purported management obligations do not support the conclusion the Membership Agreement is akin to a personal services contract. As a practical matter, ITEF's ability to appoint one of the four managers of the LLC can be likened to a shareholder's ability, in certain circumstances, to appoint a director to a corporation's board. The manager appointed by ITEF has very little to do with the day-to-day management of the LLC, and the identity of the party appointing that manager has even less to do with the day-to-day

---

[32]     *See In re* Lil' Things, 220 B.R. 583, 589 (Bankr. D.D. Tex. 1998) (quoting *In re* – Antonelli, 148 B.R. 443, 448 (D. Md. 1992)); *In re* DeLuca, 194 B.R. 79, 90 (Bankr. E.D. Va. 1996) (same); *In re* DeLuca, 194 B.R. 65, 76 (Bankr. E.D. Va. 1996) (same).

[33]     *In re* Catapult Entertainment, 165 F.3d 747, 752 (9th Cir. 1999).

operations of the LLC. Indeed, Shaw can, and probably will, appoint the same manager, Dan

Melchior, to serve on the LLC's board of managers. The Movants cannot reasonably argue that

the identity of the party appointing Mr. Melchior has any bearing or relevance to the Membership

Agreement.

37.     Proper application of section 365(e)(2)(A) similarly rests on a determination of

whether the particular contract involves services or obligations of a personal nature.[34] Indeed,

the court in *In re* Catron gave effect to an otherwise prohibited *ipso facto* clause only after first

finding the partnership at issue to be a personal services contract based on the "personal trust and

confidence" of the partners.[35] As set forth above, the identity of the party performing the

remaining obligations of ITEF, if any, is irrelevant

38.     The Movants ask that the Court give effect to provisions normally prohibited by

the Bankruptcy Code simply because such provisions are authorized by a state statute. The

logical extension of this argument would put in the hands of the various state legislatures the

power to completely eviscerate rehabilitative purpose of the Bankruptcy Code, a result surely not

intended by Congress when it enacted federal legislation to govern the reorganization of Debtors.

While the Movants make an intriguing argument that any law may constitute "applicable law" for

purposes of section 365 of the Bankruptcy Code, a more careful reading of the cases reveals that

the proper focus should be on the nature of the contract itself, and the relationships embodied

therein. To find otherwise would render meaningless section 365's prohibitions against ipso

facto, anti-assignment, right of first refusal and forced buyout clauses.

---

[34]     *See generally In re* Computer Communs. Inc., 824 F.2d 725, 726-27 (9th Cir. 1987) (focusing discussion of 362(e)(2)(A) on personal nature of contract at issue).

[35]     158 B.R. 624, 627 (E.D. Va. 1992).

39.     In recognition of the many corporate attributes of the LLC, Shaw asks that the Court find the Membership Agreement, even if it were determined to be executory, not to involve the type of personal services and obligations excepted out of section 365. Accordingly, Shaw asks that, to the extent section 365 applies to the Membership Agreement, the ipso facto, anti-assignment, right of first refusal and forced buyout clauses be found to violate the Bankruptcy Code's general prohibition against such devices.

## V.     The Proposed Buyout of ITEF's Interest Violates Section 363(l)

40.     Through the Motion and Reply, the Movants ask this court to authorize a forced sale of ITEF's interest in the LLC for an amount that is less than half the fair market value of that interest. In support of their bid to force ITEF to sell its interest in the LLC for less than half of its estimated value, the Movants ask the Court to give effect to provisions in the Membership Agreement purportedly giving them this right. While such a penalty provision might pass muster outside the bankruptcy context, section 363(l) of the Bankruptcy Code serves to reign in such avarice when it amounts to an improper forfeiture, modification or termination of the debtor's interest in such property.[36]

41.     The Tenth Circuit faced a situation remarkably similar to the one at hand in *Connolly v. Nuthatch Hill Associates*.[37] In that case, the non-debtor partners to a real estate partnership joined forces in an attempt to compel the debtor partner to sell his interest in the partnership for 75% of the value of his capital account, with no credit to be given for the substantial appreciation of the sole real estate asset of the partnership.[38] In remanding the case to

---

[36]     11 U.S.C. § 363(l).

[37]     831 F.2d 205 (10th Cir. 1987).

[38]     Id. at 206.

the Bankruptcy Court for a factual determination of whether the partners actually intended to impose such a penalty provision on defaulting partners, the Tenth Circuit directed the Bankruptcy Court to re-examine its prior finding that such a provision did not violate the anti-forfeiture provisions of the Bankruptcy Code.[39] In the alternative, the Tenth Circuit suggested that the Bankruptcy Court consider whether such a provision would, in effect, constitute unreasonable liquidated damages and, as such, produce a result disfavored by general equitable principles.[40]

42.     In this case, the Movants seek to force a sale of ITEF's interest in the LLC for approximately $3.9 million. This sum has no correlation with the actual market value of the interest in the LLC. Rather, it will result in an inequitable windfall for the Movants which certainly runs afoul of the anti-forfeiture provisions of section 363(l). Accordingly, Shaw asks that this Court strike down the buyout provisions of the Membership Agreement as violative of section 363(l). In the alternative, if the Court sees fit to give effect to the buyout provisions, Shaw asks that the court employ its equitable powers to reform the Membership Agreement to require the Movants to pay fair market value for the assets they are forcing ITEF to sell.

## VI.     CONCLUSION

43.     The Membership Agreement is not an executory contract. All parties to the Membership Agreement have substantially performed their obligations, and, as such, no party to the Membership Agreement is capable of committing a material breach authorizing the other parties to withhold their performances. Accordingly, the Membership Agreement does not meet the Countryman definition of an executory contract, and section 365 of the Bankruptcy Code is not applicable to this controversy.

---

[39]     Id. at 211

[40]     Id.

44.    Even if the Membership Agreement is deemed to be an executory contract, through the Motion and Reply, the Movants seek to take actions generally forbidden by the Bankruptcy Code. While the Bankruptcy Code does provide very limited exceptions to its prohibitions against anti-assignment, ipso-facto, right of first refusal and buyout clauses, these exceptions are not applicable to the case at hand. Rather, the Space Gateway Assets are exactly the type of valuable assets Congress sought to preserve for debtors when it drafted the protective language of sections 363(l) and 365 of the Bankruptcy Code.

45.    Accordingly, Shaw respectfully requests that this Court deny the Motion, and order that: (i) Shaw is a party in interest to this controversy pursuant to section 1109(b) of the Bankruptcy Code; (ii) either (a) the Membership Agreement is not an executory contract, and, therefore, section 365 is inapplicable thereto, or (b) in the alternative, the Membership Agreement is not the type of personal services or similar contract warranting application of the exceptions set forth in sections 365(c)(1)(A) and 365(e)(2)(A); and (iii) either (x) the forced buyout provisions of the Membership Agreement violate the anti-forfeiture limitations set forth in 365(l), and are, thus, unenforceable, or (y) to the extent the forced buyout provisions of the Membership Agreement are given effect, the Movants must pay fair market value for ITEF's interest in the LLC, as represented by Shaw's purchase price allocation thereto in connection with the Asset Purchase Agreement.

Dated: May 8, 2002

ASHBY & GEDDES

William P. Bowden  (I.D. 2553)
Christopher S. Sontchi (I.D. 3159)
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware  19899
Telephone:  (302) 654-1888
Telecopy: (302) 654-2067

and

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal
Jeremy B. Coffey
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone:  (214) 698-3100
Telecopy:  (214) 698-3400
ATTORNEYS FOR THE SHAW GROUP, INC.

109914.1

19

# CERTIFICATE OF SERVICE

I, Christopher S. Sontchi, Esquire hereby certify that on the 8th day of May, 2002, I caused a true and correct copy of the foregoing **Supplemental Response of The Shaw Group Inc. to Motion and Supplemental Reply of Northrup Grumman Technical Services, Inc. and Wackenhut Services, Inc. for an Order Granting Relief from the Automatic Stay** to be served upon the parties on the attached Service List by Overnight Mail or as otherwise indicated:


Christopher S. Sontchi

**IT GROUP**
**CORE GROUP**

The IT Group, Inc
2790 Mosside Blvd.
Monroeville, PA 15146-2792
*Debtors*

David S. Kurtz, Esq.
Timothy R. Pohl, Esq., Chris L. Dickerson, Esq.
Skadden, Arps, Slate, Meagher & Flom (Illinois)
333 West Wacker Drive
Chicago, IL 60606-1285
*Counsel to Debtors*

**VIA ELECTRONIC MAIL**
Gregg M Galardi, Esq.
Marion Quirk, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
One Rodney Square
Wilmington, DE 19801
*Counsel to the Debtor*

**HAND DELIVERY**
Mark S. Kenney, Esq.
Office of the U.S. Trustee
844 King Street
Wilmington, DE 19899
*United States Trustee*

**HAND DELIVERY**
Jeffrey M. Schlerf, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
*Counsel to Creditors' Committee*

Thomas E. Lauria, Esq.
White and Case, LLP
First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2352
*Counsel to Creditors' Committee*

Stephen Karotkin, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for Postpetition Bank Group*

**ELECTRONIC MAIL**
Richard S. Cobb, Esq.
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801
*Counsel for Postpetition Bank Group*

Todd Neilson
Neilson Elggren LLP
10100 Santa Monica Blvd., Suite 410
Los Angeles, CA 90067
*Examiner*

Richard M. Pachulski
Ira D. Kharasch
Pachulski, Stang, Ziehl, Young & Jones P.C.
10100 Santa Monica Blvd., Suite 1100
Los Angeles, CA 90067
*(Counsel to the Examiner)*

**HAND DELIVERY**
Laura Davis Jones
Pachulski, Stang, Ziehl, Young & Jones P.C.
919 North Market St., 16th Floor
Wilmington, DE 19899-8705 (Courier 19801)
*(Counsel to the Examiner)*

**HAND DELIVERY**
Laurie Selber Silverstein, Esquire
William A. Hazeltine, Esquire
Potter Anderson & Corroon
1313 N. Market Street
Wilmington, DE 19899
*Counsel to Northrop Grumman Technical Services, Inc. and*
*Wackenhut Services, Inc.*

Karen L. Manos, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel to Northrop Grumman Technical Services, Inc. and*
*Wackenhut Services, Inc.*



Buckmaster de Wolf, Esquire
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
*Counsel to Northrop Grumman Technical Services, Inc. and
Wackenhut Services, Inc.*

